STATE OF NORTH CAROLINA v. WILLIE FOSTER, JR.

No. 51

(Filed 15 November 1972)

1. **Criminal Law § 21— preliminary hearing as matter of right**

A preliminary hearing is not a necessary step in the prosecution of a person accused of crime, and an accused person is not entitled to a preliminary hearing as a matter of substantive right.

2. **Criminal Law § 21— failure to provide preliminary hearing — examination of witnesses allowed — no error**

Where scheduled preliminary hearings were postponed and eventually abandoned after the grand jury returned indictments, any irregularities which may have occurred in connection with the failure to provide a preliminary hearing for defendant were insufficient to preclude prosecution of defendant for the crimes of first degree burglary and assault with intent to commit rape, particularly where the trial court provided for an examination of the State's witnesses by defendant's counsel prior to trial.

3. **Burglary and Unlawful Breakings § 5— first degree burglary — sufficiency of evidence to withstand nonsuit**

State's evidence was sufficient to withstand nonsuit in a first degree burglary case where such evidence tended to show that an occupied dwelling was broken into during the nighttime, that things of value were stolen from the dwelling, and that a fingerprint lifted from the scene shortly after the offense and a print of defendant's index finger were identical.

4. **Indictment and Warrant § 17— variance — time not of the essence — no prejudicial error**

Where the indictment charged that the alleged burglary was committed on 5 September 1971 and the evidence tended to show that it took place on 6 September 1971, defendant was not entitled to dismissal on the ground of fatal variance since time was not of the essence of the crime and since the suggested variance would not be prejudicial to defendant. G.S. 15-155.

5. **Criminal Law §§ 60, 73— fingerprint evidence — inadmissibility as hearsay**

The admission of hearsay evidence constituted prejudicial error where such evidence consisted of testimony by defendant on cross-examination that he had hired his own fingerprint specialist who informed defendant that a fingerprint found at the crime scene and a fingerprint of defendant were identical.

APPEAL by defendant from *McLean, J.,* 1 May 1972 Schedule "C" Regular Criminal Session of MECKLENBURG Superior Court.

Defendant was tried on two bills of indictment, one charging first degree burglary and the other charging assault with intent to commit rape. The cases were consolidated for trial.

The burglary indictment charged that on 5 September 1971, during the nighttime "between the hours of 12:00 p.m. and 1:00 a.m.," defendant feloniously broke into and entered the dwelling house of James Harley Davis at 3422 Kentucky Avenue, Charlotte, N. C., then actually occupied by James Harley Davis and Rosa Davis, with the felonious intent to steal goods and chattels of James Harley Davis.

The assault indictment charged that defendant on 5 September 1971 assaulted Rosa Mae Davis with intent to rape her.

The evidence offered by the State tends to show the facts narrated below.

On 5 September 1971, all members of the Davis family were at home in their one-family dwelling at 3422 Kentucky Avenue. The family consisted of James Harley Davis (Davis), Rosa Mae Davis (Mrs. Davis), a twelve-year-old daughter and a ten-year-old son. The house had three bedrooms, a bathroom, a living room and a kitchen.

Mrs. Davis went to bed about midnight. The doors were locked. She was sleeping that night with her daughter in the front bedroom, which adjoined the living room. Davis had gone to bed "around 8:00 or 9:00 o'clock." He was sleeping that night with his son in the daughter's bedroom. The bathroom was between and accessibe from the front bedroom in which Mrs. Davis was sleeping and from the back bedroom in which Davis was sleeping. The third bedroom, the son's bedroom, was unoccupied that night. During the day the Davises had been painting in this third bedroom. The windows were left open so that the odor of the paint might get out. The screens were in place and were latched by hooks.

The weather being hot, Mrs. Davis had pushed the bedspread and sheet to the foot of the bed. She was wearing "shortie pajamas." She was awakened about 1:50 a.m. A man was leaning over her with his hand high up on the inside of her leg. When she tried to raise up, the man grabbed her arm. When she first screamed, "he was right down in [her] face saying

'sh-sh-sh.' " When she screamed the second time he stood up and turned her loose. She then sat up in bed and screamed again. When she screamed the third time, the intruder hit her in the face, knocked her back on the bed, and ran toward the living room.

Davis was awakened by his wife's screams. After searching inside and outside the house and finding no one, Davis called the police.

One of the window screens had been removed from the son's bedroom and was found lying outside beside a flower bush. It was an aluminum screen and had hinges at the top. It had been latched by a hook on the inside when Mrs. Davis went to bed. Mrs. Davis testified: "You can hit them like that and they will jump up, the hooks." The front door was unlocked.

Davis's pants, which contained a billfold containing $27, his car keys and some change, had been hanging on a chair in the bedroom where he had been sleeping. He found his pants, his *empty* billfold, his car keys and some change on the floor of his son's unoccupied bedroom. None of the missing articles was thereafter identified or recovered.

The twenty-one inch Admiral portable television set and the record player were missing from the living room. A plastic flower pot on a stand approximately two and a half feet above the floor had been on each side of the television set. The two flower pots had been moved away from their former location toward the center of the living room. Each was approximately eight or ten inches across the top.

Mrs. Davis had had the two flower pots about three years, having purchased them from a Winn-Dixie store. She had put flowers in them "lots of times." From time to time, she had taken the dead flowers out, stirred the soil up and washed the pots. These flower pots had been kept inside the house.

There was evidence that neither Mrs. Davis nor Davis had known or seen defendant prior to 5 September 1971; that defendant had never been inside the Davis home; and that defendant had no permission to enter the Davis home "to carry anything out" nor for any other purpose.

Within "about 5 or 6 minutes" after Davis called the police, Officers Cobb and Adams of the Charlotte Police Department

arrived at the Davis residence. Cobb was trained and experienced in dusting for fingerprints and had with him the necessary equipment for lifting latent prints. He first went to the open window from which the screen had been removed. He dusted for prints around the interior and exterior of this window and also dusted the screen which had been removed. However, he was unable to make any "latent lifts." He dusted elsewhere in the Davis residence without success. However, he lifted three latent prints from one of the flower pots. The lifts were made by placing a tape having the appearance of Scotch tape on top of prints which showed up in the dust. The three prints lifted from the flower pot were put on the card identified as State's Exhibit No. 1. At the Davis residence, Cobb handed this card to Adams. Adams made certain identifying notations thereon, took it to the Charlotte Police Department and placed it in the "crime lab" for the attention of Officer Stubbs.

Upon receiving State's Exhibit No. 1, Officer Stubbs, a fingerprint expert, started searching the master fingerprint file maintained in his office to see if he could identify the prints on State's Exhibit No. 1 with any print in the master file. On 20 October 1971, Cobb compared the print on State's Exhibit No. 1 with the right index finger on a fingerprint card in the master file which had been taken in 1958. Over objection, Stubbs was permitted to testify that this 1958 card had on it the name "Willie Foster, Jr." Defendant was arrested and fingerprinted on 22 October 1971 in the booking office of the county jail by Preston Pendergrass, Jr. On 12 November 1971, Stubbs personally fingerprinted defendant. A card bearing this fingerprint was identified as State's Exhibit No. 2. In his opinion, the prints of the right index finger on these fingerprint cards are identical. A photographic enlargement of each of these exhibits was offered in evidence as State's Exhibit No. 3 and used by Stubbs to illustrate his testimony to the effect that there were thirteen characteristics which are identical on both prints. Stubbs based his comparison and opinion on only one of the prints on State's Exhibit No. 1, explaining that only one disclosed enough identifying characteristics to constitute a basis for a positive opinion.

With reference to the identity of the person who assaulted her, Mrs. Davis testified in substance as follows: The light

was on in the adjoining bathroom and the door between the two rooms was partially open. Her assailant had broad shoulders, was heavy-set and was "real tall," and was "taller than [her] husband." With the exception of his eyes, the assailant's whole head (including all of his hair) was covered by a black or real dark stocking or mask. His eyes were dark, deep-set and sharp. She presumed her assailant was a man from "his size, his height, and his build." She did not know whether her assailant was "black or white." Her assailant was wearing pants and a black or real dark jacket. The jacket had white stripes down both sleeves from the tops of the sleeves.

Early in her testimony, the court permitted Mrs. Davis to testify, over defendant's objection, that defendant was her assailant, although she based her identification solely on the eyes, height and general build of her assailant. Toward the end of Mrs. Davis's testimony, the court reversed this ruling and instructed the jury not to consider Mrs. Davis's prior testimony that defendant was the man whose actions had aroused her.

The testimony of defendant and of his wife, Hazeline Foster, tends to show the facts narrated below.

Defendant, his wife and Willie, their fourteen-year-old son, live at 532 Center Street, Apartment 3. On the evening of Saturday, 4 September 1971, and throughout that night, and on the evening of Sunday, 5 September 1971, and throughout that night, defendant, his wife and son were at home.

Defendant knew that Kentucky Avenue ran within a block of where he lived. However, he did not know the location of the Davis house, had never been in it and had no explanation for Officer Stubbs's testimony that in his opinion defendant's fingerprint was on a flower pot in the Davis house, and did not know how a fingerprint of his could have gotten there.

Defendant had never had a dark or black jacket with white stripes down the sleeve nor any sort of mask to go over his head.

Although born in Lancaster, South Carolina, defendant moved to Charlotte some twenty-seven years ago, when he was six years old, and was raised in Charlotte by his grandmother. His occupations consisted of caddying for several years at the

Country Club and in doing yard work for a number of named individuals and particularly the Triple-A Heating Company. His wife also was employed, having worked for the past five years for Dr. Henry Wilson.

Defendant is "six feet three inches and a half or six feet four inches tall" and weighs "172 pounds." Three witnesses, in addition to Hazeline, testified that defendant's general reputation was excellent. One of these witnesses had known him for three years and the other two had known him for nearly ten years.

After the presiding judge had completed his original charge, and before returning their verdicts, the jury returned to the courtroom. The foreman addressed the judge as follows: "Your Honor, may I ask a question? If—I don't know how to word this, but is it possible that if per chance there was an accomplice and the accomplice opened the door, would that make any difference?" The judge replied: "Now, members of the jury, there is no evidence here that there was an accomplice." However, the judge then instructed the jury fully and accurately to the effect that where two or more persons aid and abet each other in the commission of a crime, all are guilty within the meaning of the law.

With reference to the charge of assault with intent to commit rape, the court instructed the jury they could return one of three verdicts, guilty of assault with intent to commit rape, or guilty of the lesser included offense of assault on a female by a male person over eighteen years of age, or not guilty. The jury returned a verdict of not guilty, expressly answering "not guilty" when asked separately for their verdicts, first, as to assault with intent to commit rape, and second, as to assault on a female.

To the indictment charging first degree burglary, the jury returned a verdict of guilty as charged with recommendation that defendant's punishment be imprisonment for life in the State's Prison. Thereupon, judgment imposing a life sentence was pronounced. Defendant excepted and appealed.

*Attorney General Robert Morgan, Assistant Attorney General William B. Ray and Associate Attorney Thomas W. Earnhardt for the State.*

*Hicks and Harris by Richard F. Harris III and Eugene C. Hicks III for defendant appellant.*

State v. Foster

BOBBITT, Chief Justice.

Although the undisputed and unequivocal testimony of Mrs. Davis tends to show that she was assaulted, the jury failed to find that she was assaulted by defendant. Indeed, Mrs. Davis's testimony affirmatively discloses that she could not identify defendant as her assailant. The appeal relates solely to the indictment and trial of defendant for first degree burglary.

We consider first those assignments of error which, if tenable, would require dismissal rather than a new trial.

On 14 February 1972, defendant moved that the indictments be dismissed because he had been denied a preliminary hearing. In an order dated 17 February 1972, Judge Hasty denied defendant's motion but provided for an examination of the State's witnesses by defendant's counsel prior to trial. At the commencement of the trial at the 1 May 1972 Session, the motion to dismiss was renewed by defendant and denied by Judge McLean. Defendant excepted to and assigns as error each of these rulings.

Motions filed by defendant assert the following: After his arrest on 22 October 1971, defendant was confined in jail until released on 19 January 1972. Nine warrants had been issued, two of which were for the crimes for which he was tried at the 1 May 1972 Session. Defendant was present and represented by counsel at each of five scheduled preliminary hearings. At each of the first four, the hearing was continued on motion of the State and over defendant's objection. The last was on 19 January 1972 when, by order of the presiding District Court Judge, all of the cases were dismissed from the docket of that court and in each case the entry "nolle prosse" was made.

We take judicial notice that the 3 January 1972 Session, at which the two indictments on which defendant was tried were returned, was a one-week session. A week or so after his release on 19 January 1972, defendant was rearrested on a capias based on these indictments. Seemingly, the District Court Judge who ordered defendant's release on 19 January 1972 was unaware of the fact that defendant had been indicted by the grand jury.

Admittedly, defendant was entitled to a prompt preliminary hearing. Assuming the facts to be as stated in defendant's

motions to dismiss, sufficient justification does not appear for the continued failure of the State to proceed with a preliminary hearing and its eventual abandonment of this procedure in favor of submitting a bill of indictment to the grand jury. If deemed advisable, defendant could have applied to one of the Justices or Judges of the Appellate Division or to a superior court judge for a writ of habeas corpus to review the legality of his confinement between 22 October 1971 and 19 January 1972. Upon return of such writ, the hearing Justice or Judge might well have ordered defendant's release from custody unless a prompt preliminary hearing was afforded. However, the failure of the State to proceed with the scheduled preliminary hearings did not *per se* constitute ground for complete and final dismissal of the charges against him.

[1] Neither the North Carolina nor the United States Constitution requires a preliminary hearing. A preliminary hearing is not a necessary step in the prosecution of a person accused of crime, and an accused person is not entitled to a preliminary hearing as a matter of substantive right.

"A preliminary hearing may be held unless waived by defendant. G.S. 15-85 and G.S. 15-87. But none of these statutes prescribes mandatory procedures affecting the validity of a trial. A preliminary hearing is not an essential prerequisite to the finding of an indictment in this jurisdicton." *State v. Hargett,* 255 N.C. 412, 413, 121 S.E. 2d 589, 590 (1961). "We have no statute requiring a preliminary hearing, nor does the State Constitution require it. It was proper to try the petitioner upon a bill of indictment without a preliminary hearing." *State v. Hackney,* 240 N.C. 230, 237, 81 S.E. 2d 778, 783 (1954). *Accord, Gasque v. State,* 271 N.C. 323, 329-330, 156 S.E. 2d 740, 744 (1967) ; *State v. Overman,* 269 N.C. 453, 467, 153 S.E. 2d 44, 56 (1967) ; *Vance v. North Carolina,* 432 F. 2d 984 (4th Cir. 1970) ; *Carroll v. Turner,* 262 F. Supp. 486 (E.D.N.C. 1966).

"If the grand jury finds an indictment, there is no need to conduct a preliminary examination." 21 Am. Jur. 2d Criminal Law, § 442 (1965). *Accord, Jaben v. United States,* 381 U.S. 214, 14 L.Ed. 2d 345, 85 S.Ct. 1365 (1965).

[2] When it was brought to Judge Hasty's attention that defendant's counsel had had no opportunity to examine the State's witnesses on account of the State's failure to conduct a prelimi-

nary hearing, an order was promptly made affording defendant's counsel an opportunity to conduct such examinations. Nothing in the record discloses that defendant was adversely affected at trial on account of the postponement of the scheduled preliminary hearings and the eventual abandonment of this procedure after the grand jury had returned the indictments. We hold that such irregularities as may have occurred in connection with the failure to provide a preliminary hearing for defendant were insufficient to preclude prosecution of defendant for the crimes for which he was indicted. Hence, the denial by Judge Hasty and by Judge McLean of defendant's motions to dismiss the indictments was proper.

Defendant assigns as error the denial of his motion to quash the indictment, citing *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972). *Furman* relates to punishment, not to the elements of any crime. The indictment is in proper form and sufficiently charges first degree burglary. Hence, the assignment is wholly without merit.

Defendant's further contention that the indictment is fatally defective because it does not sufficiently describe the property which defendant intended to steal is wholly without merit. 13 Am. Jur. 2d Burglary, § 36 (1964) ; 12 C.J.S. Burglary, § 39 (1938).

Defendant assigns as error the denial of his motion in arrest of judgment and as support therefor repeats the contentions previously made in connection with his motion to quash. The motion was properly denied.

[3] Defendant assigns as error the denial of his motion for judgment as in case of nonsuit.

He contends this motion should have been allowed because (1) the evidence was insufficient for submission to the jury, and (2) there was a fatal variance between the indictment and the proof.

There was ample evidence to support findings that the Davis home, then occupied by Davis, Mrs. Davis and their two children, had been feloniously broken into and entered in the nighttime with intent to commit the crime of larceny and that, in executing that intent, the television set, the record player and money were stolen.

The State's contention that defendant is guilty of burglary as charged rests upon evidence which tends to show that one of three prints lifted from one of the flower pots shortly after the breaking, entering and larceny occurred, and a print of defendant's right index finger taken by Officer Stubbs on 12 November 1971, are identical.

"To warrant a conviction, the fingerprints corresponding to those of the accused must have been found in the place where the crime was committed under such circumstances that they could only have been impressed at the time when the crime was committed." Annot., "Evidence—Finger, Palm, or Foot-print," 28 A.L.R. 2d 1115, 1154, § 29 (1953). See also *State v. Smith*, 274 N.C. 159, 164, 161 S.E. 2d 449, 452 (1968), and authorities there cited.

Davis and Mrs. Davis testified they did not know defendant and had never given him permission to enter their home. Defendant testified he had not been in the Davis home on the occasion referred to in the indictment or at any other time. There was evidence the flower pot had been frequently washed and otherwise handled by Mrs. Davis during the three years it had been in the Davis home. There was evidence that the flower pot from which the latent prints were lifted had been moved from its usual position incident to the removal and theft of the television set.

The evidence most favorable to the State would permit a jury to find (1) that the print lifted from the flower pot was in fact a print of defendant's right index finger; (2) that the latent print of defendant's right index finger was placed thereon by defendant on the occasion referred to in the indictment; and (3) that defendant was present when the crime charged in the indictment was committed and at least participated in its commission. Hence, the evidence was sufficient to warrant submission of the case to the jury.

[4] As to fatal variance, the indictment charges that the alleged burglary was committed on 5 September 1971 "between the hours of 12:00 p.m. and 1:00 a.m." We take judicial notice that 5 September 1971 was a Sunday. Both Davis and Mrs. Davis testified when they went to bed and where they slept on 5 September 1971. Their testimony contains no reference to the day of the week when they first went to bed or the day of the week when they were aroused. Defendant contends the

evidence indicates they went to bed on 5 September 1971; that their home was broken into on 6 September 1971; and that this constitutes the fatal variance. This contention is not based on unequivocal evidence. The evidence discloses that Officer Adams entered "5 Sept. 71" on State's Exhibit No. 1 after Officer Cobb had completed his efforts to lift latent fingerprints. It is noted that the court instructed the jury they would return a verdict of guilty as charged if they found beyond a reasonable doubt that on 5 September 1971 defendant had committed the acts necessary to constitute the alleged crime of burglary in the first degree. Moreover, under the circumstances, the suggested variance would not be material. Time was not of the essence of the crime. G.S. 15-155; *State v. Williams*, 261 N.C. 172, 134 S.E. 2d 163 (1964). Nor does it appear that the suggested variance would be prejudicial. Defendant's evidence tends to show that both he and his wife were at home in bed throughout the night of 4-5 September 1971 and throughout the night of 5-6 September 1971.

Although his asserted grounds for dismissal are untenable, defendant is entitled to a new trial for the reason set forth below.

[5]   According to the record during the cross-examination of defendant the following occurred:

"Q. Now, I believe you had your own hand—excuse me—your own fingerprint specialist examine those fingerprints, is that not correct?

MR. HICKS: Objection.

COURT: Overruled, exception.

EXCEPTION NO. 56

Q. You and your lawyer hired your independent fingerprint expert to examine those fingerprints, is that not correct?

MR. HICKS: Objection.

COURT: Overruled, exception. Answer the question.

EXCEPTION NO. 57

A. Yes, sir.

Q. And he told you that that fingerprint was the same as yours, is that not correct?

MR. HICKS: Objection.

COURT: Overruled, exception.

EXCEPTION NO. 58.

A. That is right."

Whatever an unidentified person referred to as a fingerprint expert may have said with reference to whether in his opinion the fingerprints on State's Exhibit No. 1 were those of defendant was hearsay and inadmissible. Defendant's objections to the quoted questions should have been sustained. The prejudicial impact of the testimony elicited by these questions is obvious. The erroneous admission thereof entitles defendant to a new trial.

Upon the present record serious questions arise as to the admission over objection of testimony regarding a master fingerprint card bearing date 1958 and the name "Willie Foster, Jr.," and of testimony relating to a card referred to as showing fingerprints of defendant taken by one Pendergrass when defendant was booked on 22 October 1971, in the absence of testimony that the prints on these cards were made by defendant. A discussion of these questions is deemed unnecessary. If they arise at all at the next trial, presumably there will be additional evidence as to when and by whom these prints were taken.

Discussion of defendant's remaining assignments is unnecessary. They relate to questions which may not arise at the next trial.

New trial.