STATE OF NORTH CAROLINA v. BOBBY DEAN SCOTT

No. 37

(Filed 5 February 1979)

**Homicide § 21.5; Criminal Law § 60.5— first degree murder—fingerprint—time of impression—insufficiency of evidence**

    In a prosecution for attempted robbery and first degree murder, evidence was insufficient to be submitted to the jury where the only evidence tending to show that defendant was ever in the home of deceased, the scene of the murder, was a thumbprint found on a metal box in the den on the day of the murder; but testimony by deceased's niece who lived in the same house that she had never seen defendant in the house and that only family members handled the metal box did not constitute substantial evidence that defendant's thumbprint could only have been imprinted on the box during the course of the attempted robbery which culminated in deceased's death, since the niece testified that she worked in a nearby city five days of the week and did not have an opportunity to observe during the week who came to the house on business or to visit with her uncle.

    Justices BRITT and BROCK did not participate in the consideration or decision of this case.

APPEAL by defendant under G.S. 7A-27(a) from *Lupton, J.*, at the January 1978 Session of the Superior Court of CABARRUS.

Upon indictments, proper in form, defendant was convicted of the attempted armed robbery and first degree murder of Clyde Goodnight on 7 May 1970. He appeals from a sentence of life imprisonment imposed upon his conviction of first degree murder.

Defendant offered no evidence. Evidence for the State tended to show the following facts:

About 6:00 p.m. on 7 May 1970, Isabelle Goodnight found the body of her uncle, Clyde Goodnight, a 72-year-old farmer, in the

living room of his two-story home in the Odell community of Cabarrus County. Prior to his death Clyde Goodnight lived there with his brother, W. O. Goodnight, and his brother's daughter, Isabelle. Both W. O. Goodnight and his daughter worked in Charlotte during the day. W. O. Goodnight (who died prior to the trial of this case) had been employed there for a number of years. Isabelle had been working in Charlotte five days a week for about a year at the time of her uncle's death. In consequence she did not ordinarily see him between 7:00 in the morning and 6:00 at night. The deceased, Clyde Goodnight, raised livestock and worked only on the farm.

Isabelle Goodnight testified that on 7 May 1970, when she left for work at 7:00 a.m., her uncle was alive and in good health. When she returned home about 6:00 p.m. she entered the house at the rear through an enclosed porch, used as a den, the door and windows of which were usually left unlocked. Her father, who had preceded her, was sitting in a reclining chair in the den. After speaking to him, Isabelle left the den and walked through the back of the hall into her downstairs bedroom. There she saw that drawers had been pulled out and their contents dumped on the floor. She then opened the door which connected her bedroom with the living room on the front of the house.

Upon entering the living room Isabelle saw her uncle lying, face down, with his head in a pool of congealed blood. His hands and feet had been tied with adhesive tape. Hearing her father coming through the house behind her, she turned to prevent him from seeing the body. She "told him that Clyde was on the living room floor" and they "needed help." They returned to the den and telephoned the Sheriff's Department. Law enforcement officers arrived at the house around 6:15 p.m.

In the opinion of the medical examiners Clyde Goodnight had been dead at least two or three hours. His death was caused by a bullet which had entered his head behind his left ear and cut a ragged path through his brain. Powder burns indicated that the lethal weapon had been fired only six to eight inches from the deceased's head.

Although most of the house had been ransacked—drawers pulled out and items strewn on the floor—the only property missing was the deceased's pocket watch and the money from his wal-

let. The only evidence in the record which connects defendant with the murder is a partial right thumbprint, State's Exhibit 16 (S-16), which was found on a small metal box on top of the desk in the den. This box, which contained insurance papers, old deeds, and odds and ends, was kept in a closed, but unlocked, filing cabinet in the den. Only "immediate family members" used the box and they went into it about once every three months. The thumbprint from this box was lifted on 8 May 1970 by Jack B. Richardson, Special Agent with the State Bureau of Investigation.

Special Agent Steven R. Jones, who qualified as an expert in fingerprint identification and comparisons, testified that, in his opinion, the thumbprint found on the metal box matched the thumbprint of the defendant; that he had compared the thumbprint (S-16) with a set of rolled ink impressions (S-15) obtained from the defendant at the time of his arrest; and that he had "an opinion fully and entirely satisfactory to himself" that the same thumb which made the print on the rolled ink impressions made the latent print on the metal box (S-16). Special Agent Jones also testified that the length of time a latent print would stay on a metal object like the box found on the desk in the den would vary depending upon conditions, but that a print "could stay there for a period of weeks."

Except for the four-year period, 1944-1948, Isabelle Goodnight had lived in the house where her uncle was killed all of her life. She testified that defendant was "a total stranger" to her; that in May of 1970 she did not know the defendant, had never seen him; and that to her knowledge he had never visited the house. When she left for work on May 7th, she had noticed that the filing cabinet doors were closed. When she returned home she observed that the doors were open and the box was on the desk. From the beginning she was careful "not to disturb anything in the house" and not to "change the condition of anything" until the officers had completed their investigation.

At the conclusion of the State's evidence defendant also rested and moved that the charges against him be dismissed by a judgment as of nonsuit. The court denied this motion. In due course, thereafter, the case was submitted to the jury, which found defendant guilty of attempted armed robbery and first degree murder. Because the attempted armed robbery had been

used to prove an essential element of the charge of the first degree murder of which defendant was convicted, G.S. 14-17 (1969), the court arrested judgment upon the robbery charge. *State v. McZorn*, 288 N.C. 417, 436, 219 S.E. 2d 201, 213 (1975). Upon his conviction of first degree murder the trial court imposed upon defendant the mandatory sentence of life imprisonment, *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d (1973), and defendant appealed to the Supreme Court as a matter of right.

*Attorney General Rufus L. Edmisten and Assistant Attorney General Isham B. Hudson, Jr., for the State.*

*Clarence E. Horton, Jr., for defendant.*

SHARP, Chief Justice.

The decisive question on this appeal is whether the trial court erred in overruling defendant's motion for judgment as of nonsuit. Such a motion requires the Court to consider all the evidence in the light most favorable to the State and to give the State the benefit of every reasonable inference to be drawn from it. In this case the State relied solely upon circumstantial evidence. However, if there is substantial evidence to support a finding that the offense charged has been committed and that defendant committed it, the motion to nonsuit should be denied whether the evidence be direct, circumstantial or both. *State v. McKinney*, 288 N.C. 113, 215 S.E. 2d 578 (1975).

The only evidence tending to show that defendant was ever in the home of Clyde Goodnight is a thumbprint found on a metal box in the den on the day of the murder. The determinative question, therefore, is whether the State offered substantial evidence that the thumbprint could only have been placed on the box at the time of the homicide.

This Court has considered the sufficiency of fingerprint evidence to withstand a motion to nonsuit in a number of cases. *See, e.g., State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977); *State v. Miller*, 289 N.C. 1, 220 S.E. 2d 572 (1975); *State v. Jackson*, 284 N.C. 321, 200 S.E. 2d 626 (1973); *State v. Foster*, 282 N.C. 189, 192 S.E. 2d 320 (1972); *State v. Smith*, 274 N.C. 159, 161 S.E. 2d 449 (1968); *State v. Tew*, 234 N.C. 612, 68 S.E. 2d 291 (1951); *State v. Reid*, 230 N.C. 561, 53 S.E. 2d 849, *cert. denied,* 338 U.S. 876

(1949); *State v. Minton*, 228 N.C. 518, 46 S.E. 2d 296 (1948). As Justice Huskins succinctly stated in *State v. Miller*, 289 N.C. at 4, 220 S.E. 2d at 574:

"These cases establish the rule that testimony by a qualified expert that fingerprints found at the scene of the crime correspond with the fingerprints of the accused, when accompanied by substantial evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed, is sufficient to withstand motion for nonsuit and carry the case to the jury. The soundness of the rule lies in the fact that such evidence logically tends to show that the accused was present and participated in the commission of the crime.

"What constitutes substantial evidence is a question of law for the court. What the evidence proves or fails to prove is a question of fact for the jury. *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431 (1956)."

Circumstantial evidence that the fingerprint could only have been impressed at the time the crime was committed comes in several different forms. *See* Annot., 28 A.L.R. 2d 1115, 1154-57 (1953). The form of the evidence is immaterial so long as it substantially demonstrates that the fingerprint could have been placed at the scene only at the time the crime was committed. In a number of cases the evidence has consisted in part of denials by the defendant that he was ever on the premises where the crime occurred. *E.g.*, *State v. Miller*, supra; *State v. Foster*, supra. In others the occupant of the premises, who might reasonably be expected to have seen the defendant had he ever been there lawfully, has been able to testify that he had never given the defendant permission to come on the premises or seen him there before the commission of the crime. This kind of evidence is particularly convincing when the scene of the crime is a private residence not accessible to the general public. *E.g.*, *State v. Jackson*, supra; *State v. Foster*, supra; *State v. Tew*, supra; *State v. Reid*, supra. In other cases the circumstantial evidence has consisted of an identification of the defendant, *State v. Jackson*, supra; the discovery of the fruits of the crime in his possession, *State v. Irick*, supra; and the establishment of a link between the defendant and the tools used in the commission of the crime, *State v. Reid*, supra; *State v. Huffman*, 209 N.C. 10, 182 S.E. 705 (1935).

When a defendant takes the stand and denies that he was ever at the scene of the crime, his inability to offer a plausible explanation of the presence of his fingerprints is some evidence of guilt. Coupled with the appearance of his fingerprints at the scene, it may be enough to send the case to the jury. *See, e.g., State v. Miller,* supra. In the present case defendant did not testify and offered no evidence. The Court is not permitted to infer from defendant's silence that his fingerprint could only have been impressed upon the box during the commission of the crime. "Neither the court nor the jury may draw any inference from the election by the defendant not to offer evidence in his own behalf." *State v. Cutler,* 271 N.C. 379, 384, 156 S.E. 2d 679, 682 (1967).

The only evidence in this case to prove when the fingerprint could have been impressed was the testimony of Isabelle Goodnight, the niece of the deceased. She testified that she had lived at her uncle's house continuously since 1948, that to her knowledge the defendant had never visited the house, and that during a twenty-year period she had never seen anyone but family members handle the metal box on which the defendant's fingerprint was discovered. However, Miss Goodnight also testified that in the year preceding her uncle's death she worked in Charlotte on weekdays, and on these days—as on the day of the murder— she normally did not see her uncle from very early in the morning until five or six o'clock at night. Thus, during the week, she had no opportunity to observe who came to the house on business or to visit with her uncle.

The case, therefore, comes to this: Does Miss Goodnight's testimony constitute "substantial evidence" that defendant's thumbprint could only have been imprinted on the box during the course of an attempted robbery which culminated in Clyde Goodnight's death?

Statements by the occupant of the locus in quo tending to show that the defendant had never been seen on the premises where the crime occurred have played an important role in a number of cases. For example, in *State v. Jackson,* supra, the defendant was convicted of rape and nonfelonious breaking and entering. The State's evidence tended to show that the prosecutrix was awakened in her upstairs apartment by a man who held a pair of shears at her throat, demanded money, and then

raped her. The defendant's fingerprint was discovered on a window sash inside the house. The victim, who was unable to identify the defendant by sight, identified him positively by the sound of his voice. She also testified that she had never seen the defendant before the morning of the assault. The Court held this evidence sufficient to take the case to the jury.

In *State v. Foster*, supra, the defendant's latent prints were found on a flower pot which had been moved during the burglary of a suburban home. The owners testified that they did not know the defendant and had never given him permission to enter their house. Defendant testified that he had not been in the house on the night of the burglary or at any other time. This evidence was held sufficient to withstand a motion for nonsuit.

On its facts, *State v. Tew*, supra, is probably the closest case to this one. The defendant Tew, who did not testify, was convicted of breaking and entering and larceny after his fingerprints were found on a piece of broken glass which had been removed from the front door of a service station during a robbery. The only other evidence for the State was the proprietor's testimony that she personally attended the station and had never before seen the defendant. The court held this evidence sufficient to go to the jury.

Each of the foregoing cases can be distinguished from the case at hand. In both *Jackson* and *Foster* the prosecuting witnesses were in a position to have personal knowledge of all persons visiting the premises and in both cases there was some additional evidence of guilt. In *Jackson*, the victim was able to identify the defendant as her assailant. Identification testimony is highly persuasive and would have been enough by itself to take the case to the jury. In *Foster* the defendant denied robbing the house but testified that he had no explanation of how his fingerprints came to be on the flower pot.

In *State v. Tew*, the only evidence linking the defendant's fingerprint to the offense charged was the prosecuting witness's testimony that she had never seen the defendant on the premises before the day of the robbery. A crucial distinction exists, however, between the facts in *Tew* and those now before this Court. In *State v. Tew* the proprietor personally attended the service station and was in a position to testify of her own knowl-

edge that the defendant had never visited the station. The weight to be given this testimony was a matter for the jury. Isabelle Goodnight, on the other hand, worked during the day and was unable to testify from personal knowledge as to who visited her uncle during her absence. In the absence of additional evidence, it is not unreasonable to infer that the defendant's fingerprint might have been impressed on the box at some time prior to the homicide. In short, the evidence presented by the State does not substantially exclude the possibility that the defendant might have visited the house for some lawful or unlawful purpose in the weeks preceding the murder.

Clyde Goodnight, who had apparently retired from active farming, still raised hogs and, "once in a while," a calf. The porch where the fingerprint was found, and which served as the family's business office, was located at the rear of the house. The State's expert witness testified that the thumbprint might have been placed on the box several weeks before the homicide. It is apparent, therefore, that during that period defendant could have either entered the porch unlawfully without the occupant's knowledge or lawfully to transact business with the deceased. Isabelle Goodnight, as she freely conceded, was simply not in a position to know who came into the house "during the five week days."

In the light of all these facts, we are constrained to hold that the evidence was insufficient to withstand a motion to dismiss. The burden is not upon the defendant to explain the presence of his fingerprint but upon the State to prove his guilt. As we observed upon a similar occasion in *State v. Cutler*, 271 N.C. 379, 383, 156 S.E. 2d 679, 682 (1967): We reach the conclusion that the evidence introduced in the present case "is sufficient to raise a strong suspicion of the defendant's guilt[1] but not sufficient to remove that issue from the realm of suspicion and conjecture." *See also State v. Jones*, 280 N.C. 60, 184 S.E. 2d 862 (1971); *State v. Smith*, 274 N.C. 159, 161 S.E. 2d 449 (1968); *State v. Minton*, 228 N.C. 518, 46 S.E. 2d 296 (1948).

1. For circumstances which enhance the suspicion that defendant in this case was involved in the murder of Clyde Goodnight, see the preliminary statement of facts in the case of *State v. Vaughn*, 296 N.C. 167, --- S.E. 2d --- (1978). In that case this Court affirmed the defendant Vaughn's conviction of the murder of Clyde Goodnight.

Hensley v. Caswell Action Committee

Defendant's motion to dismiss is allowed and the case is remanded to the Superior Court of Cabarrus County for the entry of a judgment of nonsuit.

Reversed.

Justices BRITT and BROCK did not participate in the consideration or decision of this case.