An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1141

NORTH CAROLINA COURT OF APPEALS

Filed: 6 May 2014

STATE OF NORTH CAROLINA

v.

JERMAINE DEPRIE GLOVER

Henderson County
No. 10 CRS 53859

Appeal by defendant from judgment entered 7 May 2013 by Judge Alan Z. Thornburg in Henderson County Superior Court. Heard in the Court of Appeals 4 March 2014.

> *Attorney General Roy Cooper by Assistant Attorney General Mary Carla Hollis for the State.*

> *Ryan McKaig for defendant-appellant.*

STEELMAN, Judge.

Where the State presented sufficient evidence of defendant's identity as the perpetrator of the murder, the trial court did not err by denying his motions for dismissal.

## I. Factual and Procedural Background

In October 2009 defendant and Misty Carter had been in a relationship for several months. They lived together but had not

been physically intimate for some time, and both were also seeing other people. Around this time defendant offered to sell a car to Jessica Levitt, an employee of a local Enmark gas station where defendant was a regular customer. In discussing the possible sale, defendant told Ms. Levitt that his relationship with Ms. Carter was unsatisfactory, that "she was cheating on him and it upset him," and that "he was going to take care of the problem" and planned to "kick her out" of his trailer.

In early October Ms. Carter learned that she was pregnant, and planned to leave defendant to live with the baby's father, a man named Dewayne Boyd. Ms. Carter spent the weekend of 16-18 October 2009 with her sister, Crystal Branson, and Mr. Boyd. On Friday, 16 October 2009, Ms. Carter was driving a Mitsubishi Eclipse that defendant had purchased for her. Ms. Branson noticed that the vehicle was "spotless" and that Ms. Carter had "new clothes, her hair freshly done, [and] her nails were freshly done," all of which had been paid for by defendant. After spending the weekend together, Ms. Carter left Ms. Branson's house at around 1:00 p.m. on 18 October 2009.

In the early morning hours of 19 October 2009, Roger Burns, who lived next door to defendant and Ms. Carter, was awakened by the sounds of defendant and Ms. Carter arguing. He also heard

the voice of a third person. Mr. Burns heard defendant and Ms. Carter arguing for ten or fifteen minutes. He then heard Ms. Carter make a "hollering" sound, after which "it got quiet." Shortly thereafter, Mr. Burns saw defendant backing his truck up to the deck of his trailer, and heard the truck drive away, accompanied by another vehicle that left from the place where Ms. Carter usually parked her car. When Mr. Burns saw defendant's truck the next day, he noticed that it was wet with "water dripping off it," although it had not rained the previous night. Law enforcement officers performed a forensic search of defendant's truck several months later, but did not detect blood or other forensic evidence.

Before dawn on 19 October 2009, Gerald Knaus was driving on the Blue Ridge Parkway towards Mt. Pisgah, when a pickup truck approached him from the opposite direction. The two vehicles slowed to about ten miles an hour to avoid colliding, and passed within an arm's length of each other. Mr. Knaus noticed the driver's "unique" appearance, and after he saw a newspaper photograph of defendant, Mr. Knaus identified him as the driver of the truck. Mr. Knaus continued up the mountain for two or three miles, until he came upon the body of a woman lying on the side of the road. The body, which was nude except for a head

wrapping, had been set on fire and was still "smoldering." The body was subsequently identified as Ms. Carter.

A short time later, SBI Special Agent Jim McClelland arrived at the location where the body was found, and observed that her "head was wrapped in a burnt cloth in a burnt plastic bag." The wrapping around her head contained a great deal of blood, and was composed of layers that included fabric, black plastic, and a cloth tie. Some of the wrappings were consistent with materials later found in defendant's trailer. There was a strong odor of a petroleum-based product about the body, and subsequent testing indicated that gasoline had been used to set the body on fire.

Later that morning, Ms. Carter's 2000 Mitsubishi Eclipse was found at a Shell gas station not far from where the body was discovered. Surveillance video showed the vehicle entering the gas station in the early morning hours of 19 October 2009. Although her car had been "spotless" the day before, the floorboard was now covered with mud, leaves, and pine straw. The front passenger seat was pushed back and Agent McClelland observed a "large soaking reddish brown stain on the seat." This was determined to be a bloodstain that matched Ms. Carter's DNA profile. Items belonging to Ms. Carter, including her wallet and ATM cards, were found inside the car.

On the afternoon of 19 October 2009, defendant asked employees of the Enmark station for permission to dispose of trash in their dumpster. Although defendant was a regular customer there, he had never previously made such a request. The video surveillance camera captured him leaving a black trash bag in the dumpster. On 21 October 2009, SBI Assistant Special Agent Tom Ammons found a black plastic bag in the dumpster containing items belonging to defendant and Ms. Carter, including mail addressed to each of them and a car title.

The autopsy of Ms. Carter revealed that her death was caused by "a deep penetrating wound" to the left front of her head, "from the eye up into the scalp area" and "into the skull" resulting in fractures and brain injury. Although the murder weapon was not identified, the pathologist who performed the autopsy determined that the wound had been inflicted by a "heavy instrument" with "at least a four-inch long sharp surface, such as an ax," "a meat cleaver," or another object that "would have that sort of shape and would be able to be wielded to form such a heavy wound that went right through the skull and caused all of those fractures."

After 19 October 2009, defendant returned rented furniture to the rental company, including a couch that was missing a cushion. Defendant claimed that a dog had "eaten" the cushion.

In examining defendant's trailer, Agent McClelland saw no dog beds, or "any other items related to a pet or a dog, water bowls, dog leashes, [or] food bowls[.]"Stains on the furniture returned by defendant, including stains that would have been under the missing cushion, contained blood that matched Ms. Carter's DNA profile. Ms. Carter's blood was also found on the floor and walls of defendant's trailer.

Defendant had a prosthetic leg resulting from an amputation below his knee. Shaun Dolen, a prosthetist who had provided prosthetic care to defendant, recalled that prior to Ms. Carter's death defendant was an "active amputee" and walked without a discernable limp. However, after Ms. Carter's body was found, defendant was observed walking with a pronounced limp, and told Mr. Dolen that he "couldn't have" killed Ms. Carter. This made Mr. Dolen uncomfortable, since he believed that defendant "would have had the ability to have done what he is charged with."

In 2009, Kelly Foster was a manager at American General Financial Services, which had provided financing for defendant's purchase of two vehicles. In the fall of 2009, Ms. Foster spoke with defendant several times about his accounts. Prior to the death of Ms. Carter, defendant's gait was normal, and Ms. Foster did not realize that he had a prosthesis. However, after Ms.

Carter's body was discovered, defendant walked with a "very pronounced" limp. In addition, after Ms. Carter's body was discovered, defendant "consistently would volunteer information" about the murder, despite Ms. Foster's efforts to keep their discussions "on a professional level." He told Ms. Foster that "there was no way that he could commit the murder" and that "they [didn't] have anything on him to show that he would have done that." Defendant "brought up the subject that he had assisted Misty in trying to buy her a car" and "appeared to be angry that he had spent money on helping her buy a vehicle." He told Ms. Foster "that he would not be able to do the things that they said that he could do, that he would not be able to lift a 200-plus pound person and move her body," while at the same time gesturing "as if he was picking something up and laying it on his shoulder, hoisting it up with a motion." Defendant's comments made Ms. Foster "very uncomfortable" and she informed local law enforcement officers about their conversations.

Defendant was indicted for the first-degree murder of Ms. Carter on 9 August 2010. He was initially tried at the 26 February 2013 Session of Criminal Superior Court for Henderson County. However, the trial judge declared a mistrial when the jury was unable to reach a unanimous verdict. Defendant was tried a second time before Judge Thornburg, beginning on 22

April 2013. On 7 May 2013 the jury returned a verdict finding defendant guilty of second degree murder. The trial court sentenced defendant to a term of 157 months to 198 months imprisonment.

Defendant appeals.

## II. Denial of Defendant's Motions to Dismiss

In the sole issue raised on appeal, defendant argues that the trial court erred by denying his motions to dismiss the charge against him for insufficiency of the evidence. We disagree.

## A. Standard of Review

"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied. If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed." *State v. Mercer*, 317 N.C. 87, 96, 343 S.E.2d 885, 890-91 (1986) (citing *State v. Roseman*, 279 N.C. 573, 184 S.E. 2d 289 (1971), and *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967)) (other citations omitted). "Whether the evidence

presented at trial is substantial evidence is a question of law for the court. 'Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion.'" *State v. Miles*, __ N.C. App. __, __, 730 S.E.2d 816, 822 (2012) (citing *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982), and quoting *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002)) (other citation omitted), *aff'd*, 366 N.C. 503, 750 S.E.2d 833 (2013). In ruling on a motion for dismissal:

> The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion.

*State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980) (citing *State v. Thomas*, 296 N.C. 236, 250 S.E. 2d 204 (1978)) (other citation omitted).

"The test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. 'When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of

defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.'" *Powell* 299 N.C. at 99, 261 S.E.2d at 117 (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E. 2d 661, 665 (1965) (other citations omitted). "It is immaterial that any individual piece of circumstantial evidence, taken alone, is insufficient to establish the identity of the perpetrator. If all the evidence, taken together and viewed in the light most favorable to the State, amounts to substantial evidence of each and every element of the offense and of defendant's being the perpetrator of such offense, a motion to dismiss is properly denied." *Mercer* 317 N.C. at 98, 343 S.E.2d at 892 (citing *State v. Ledford*, 315 N.C. 599, 340 S.E. 2d 309 (1986)) (other citation omitted).

## B. Analysis

First-degree murder is the "'intentional and unlawful killing of a human being with malice and with premeditation and deliberation.' Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Smith*, 347 N.C. 453, 463, 496 S.E.2d 357, 363 (1998) (quoting *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 337 (1986), and citing *State v. Brown*, 300 N.C. 731,

735, 268 S.E.2d 201, 204 (1980)). Defendant does not dispute the sufficiency of the evidence that Ms. Carter was murdered, but challenges only the sufficiency of the evidence that he was the perpetrator. "Where, as here, defendant does not dispute that the victim died by virtue of a criminal act, asserting only that the evidence presented was insufficient to support a reasonable finding that defendant was the perpetrator of the offense, we review the evidence for 'proof of motive, opportunity, capability and identity, all of which are merely different ways to show that a particular person committed a particular crime.' . . . Whether the State has presented sufficient evidence to identify defendant as the perpetrator of the offense is not subject to 'an easily quantifiable bright line test.'" *Miles*, __ N.C. at __, 730 S.E.2d at 822-23 (quoting *State v. Bell*, 65 N.C. App. 234, 238-39, 309 S.E.2d 464, 467-68 (1983)). There are "numerous cases in which our courts have held that circumstantial evidence is adequate to support a conviction of murder." *State v. Curry*, 203 N.C. App. 375, 396, 692 S.E.2d 129, 144 (citing *State v. Franklin*, 327 N.C. 162, 172, 393 S.E.2d 781, 787-88 (1990)), *disc. review denied*, 364 N.C. 437, 702 S.E.2d 496, (2010). In this case, after a careful review of all of the evidence, we hold that the State presented sufficient

evidence to permit a reasonable juror to find that defendant killed Ms. Carter.

In *State v. Brown*, 350 N.C. 193, 202, 513 S.E.2d 57, 63 (1999), our Supreme Court held:

> It is well established that "in a criminal case . . . evidence is competent and relevant . . . if it reasonably allows the jury to draw an inference as to a disputed fact." . . . [W]e hold that evidence of motive is always relevant and admissible where it tends to show that the defendant committed the alleged act.

(quoting *State v. Jones*, 336 N.C. 229, 243, 443 S.E.2d 48, 54 (1994) (internal citation omitted)). In this case, evidence pertaining to motive included the following:

> 1. In October 2009, defendant and Ms. Carter lived together but had not been physically intimate for some time. Ms. Carter was expecting the birth of a child fathered by Mr. Boyd, and planned to leave defendant.
>
> 2. When Ms. Carter spent the weekend of 17 and 18 October 2009 with Mr. Boyd and Ms. Branson, she drove a car that defendant had recently bought her, and had new clothes, fresh hair styling and a new manicure, all of which defendant had paid for.
>
> 3. Defendant told Ms. Levitt that Ms. Carter "was cheating on him and it upset him" but that "he was going to take care of the problem" and planned to "kick her out" of his trailer.
>
> 4. After the death of Ms. Carter, defendant talked to Ms. Foster and seemed angry about the fact that he had spent money to buy Ms. Carter a car.

This evidence would allow a reasonable juror to infer that defendant had the motives of jealousy and anger for murdering Ms. Carter. Defendant was angry because, although he lived with Ms. Carter and had spent money to buy her a car and other items, she was pregnant with another man's child and planned to leave defendant.

Regarding evidence of opportunity, we have held that "[i]n order for this Court to hold that the State has presented sufficient evidence of defendant's opportunity to commit the crime in question, the State must have presented at trial evidence not only placing the defendant at the scene of the crime, but placing him there at the time the crime was committed." *State v. Hayden*, 212 N.C. App. 482, 488, 711 S.E.2d 492, 497 (citing *State v. Pastuer*, 205 N.C. App. 566, 572, 697 S.E.2d 381, 386 (2010), *aff'd per curiam by an equally divided court*, 365 N.C. 287, 715 S.E.2d 850 (2011), and *State v. Scott*, 296 N.C. 519, 522, 251 S.E.2d 414, 416-17 (1979)), *disc. review denied*, 365 N.C. 349, 717 S.E.2d 737 (2011). Evidence that is sufficient to permit a "reasonable juror [to] conclude that defendant was in the vicinity of . . . the scene of the crime at the time of death" "establish[es] defendant's opportunity to commit the murder." *Miles* at __, 730 S.E.2d 823. In this case, evidence that defendant was present at the scene of Ms. Carter's

death and thus had the opportunity to kill her includes the following:

1. During the early morning hours of 19 October 2009, defendant's next door neighbor heard defendant arguing loudly with Ms. Carter for ten or fifteen minutes, until Ms. Carter made a "hollering" sound, followed by silence. He then saw defendant back his truck up to the deck of his trailer, and heard defendant drive his truck away, along with another vehicle that left from the place where Ms. Carter usually parked her car.

2. Ms. Carter's blood was found on defendant's sofa, floor, and wall.

3. Ms. Carter's vehicle was discovered at a nearby gas station, where surveillance video showed that it had been driven and parked in a remote corner of the gas station parking lot within an hour or two of the time that Mr. Burns recalled hearing the fight between defendant and Ms. Carter.

4. Although Ms. Carter's car was "spotless" the day before, when it was found in the parking lot there was mud, leaves, and pine straw on the floorboard. There was a "large soaking reddish brown stain" on the passenger seat, which was determined to be a bloodstain matching Ms. Carter's DNA profile.

5. The day after Ms. Carter's death, defendant's truck was wet, although it had not rained, and subsequent examination of the truck did not reveal the presence of blood.

This evidence was sufficient to permit a reasonable juror to find that (1) defendant and Ms. Carter were both at

defendant's trailer during the early morning hours of 19 October 2009; (2) during an argument, defendant struck and killed Ms. Carter; (3) after killing Ms. Carter, defendant transported her body in her car; and (4) defendant washed his truck to eliminate evidence of the murder. These inferences are supported by evidence that Ms. Carter was "hollering" and then abruptly became silent, by the presence of her blood at various places in the trailer, and by the condition of her car and the presence of her blood in the car's interior.

Although "evidence of *either* motive or opportunity alone is insufficient to carry a case to the jury. . . . [w]hen the question is whether evidence of both motive and opportunity will be sufficient to survive a motion to dismiss, . . . [the] answer appears to rest more upon the strength of the evidence of motive and opportunity, as well as other available evidence, rather than an easily quantifiable 'bright line' test." *Bell*, 65 N.C. App. at 238-39, 309 S.E.2d at 467-68 (citations omitted (emphasis in original). In this case, the other available circumstantial evidence of defendant's guilt was substantial, and included the following:

> 1. Before dawn on the morning of 19 October 2009 Mr. Knaus was driving on the Blue Ridge Parkway towards Mt. Pisgah, when a truck approached him from the opposite direction. Both vehicles slowed to about ten m.p.h. and passed within an "arms' length" of each

other, allowing Mr. Knaus to see the driver clearly. Mr. Knaus identified defendant as the driver of this truck.

2. About two or three miles from the location where defendant and Mr. Knaus passed each other, Mr. Knaus came upon a body by the side of the road. The body was wearing only a head wrap and had been set on fire so recently that it was still "smoldering." This body was subsequently identified as Ms. Carter.

3. On 19 October 2009, defendant asked if he could dispose of trash at a local gas station near his house, and was videotaped leaving a black plastic bag in the gas station dumpster. Law enforcement officers later found a black bag in the dumpster that contained items belonging to defendant and Ms. Carter, including mail addressed to defendant and to Ms. Carter and a car title.

4. Following Ms. Carter's death, defendant returned rental furniture to the rental company. A cushion was missing from a couch defendant returned, which he explained by saying that a dog had "eaten" the cushion, although his house contained no evidence of a dog or other pet. Forensic analysis revealed bloodstains originating from Ms. Carter at various locations in defendant's trailer, as well as on the couch he returned, including the area that would have been beneath the missing cushion.

5. Defendant had a prosthetic leg resulting from an amputation below his knee. Prior to Ms. Carter's murder, he was an "active amputee" and walked well enough that it was not apparent that he had a prosthesis. However, after Ms. Carter's death, defendant began walking with a pronounced limp and making statements to others about his purported physical inability to have killed Ms. Carter.

6. Defendant had several conversations with Kelly Foster. After Ms. Carter's death, defendant "consistently would volunteer information" about the murder, despite Ms. Foster's efforts to keep their discussion "on a professional level." Defendant asserted that law enforcement officers lacked any proof of his involvement in the crime and that he was physically incapable of lifting Ms. Carter. Defendant's persistent discussion of the murder made Ms. Foster so uncomfortable that she reported his comments to law enforcement officers.

This evidence would permit the jury to make logical inferences that, in an effort to avoid prosecution for the murder of Ms. Carter, defendant (1) left Ms. Carter's car in a parking lot; (2) drove to a remote area and left Ms. Carter's body by the side of the Blue Ridge Parkway after setting it on fire; (3) removed evidence that Ms. Carter had lived with him by throwing away items associated with her presence in his trailer; (4) tried to eliminate evidence of the murder by discarding a bloodstained couch cushion and proffering an explanation for its absence that lacked credence; (5) adopted a limping gait to create the impression that his mobility and physical capabilities were limited, and (6) was so persistent in discussing Ms. Carter's death with Ms. Foster that she felt it wise to inform law enforcement authorities.

We hold that this evidence, in conjunction with the evidence of defendant's motive and opportunity to kill Ms.

Carter, was sufficient to submit the charges of first and second degree murder to the jury, and that the trial court did not err by denying defendant's motions to dismiss.

In arguing for a contrary result, defendant does not deny the existence of this evidence. Instead, he attempts to minimize the importance of this evidence, raises challenges to the credibility of the witnesses, speculates on the possibility that someone other than defendant killed Ms. Carter, and directs our attention to various inconsistencies and discrepancies in the evidence. It is well-established that "contradictions and discrepancies do not warrant dismissal of the case - they are for the jury to resolve." *Earnhardt*, 307 N.C. at 67, 296 S.E.2d at 653.

We hold that the trial court did not err by denying defendant's motions for dismissal.

NO ERROR.

Judges McGEE and ERVIN concur.

Report per Rule 30(e).