STATE OF NORTH CAROLINA v. HAROLD VERNARD QUICK

No. 541A87

(Filed 12 June 1991)

**1. Jury § 7.11 (NCI3d)— first degree murder—jury selection— excusal for cause—opposition to death penalty**

The trial court did not err in a prosecution for first degree murder and robbery by excusing prospective jurors for cause or by allowing the State to excuse prospective jurors for cause where the court gave preliminary instructions and inquired about beliefs concerning the death penalty; one juror raised his hand and was questioned further; neither counsel for defendant nor counsel for the state had questions for that juror; the juror was excused for cause; two replacement jurors, in succession, declared an inability to follow North Carolina's capital sentencing law and were excused for cause; and the state excused eleven prospective jurors for cause based on their responses to death penalty questioning.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

1

STATE v. QUICK

[329 N.C. 1 (1991)]

2. **Jury § 7.11 (NCI3d)— first degree murder—jury selection— right to rehabilitate juror**

There is no right to question or rehabilitate a juror in a capital case when the juror has expressed a clear and unequivocal refusal to impose the death penalty under all circumstances.

**Am Jur 2d, Jury §§ 201, 289, 290.**

**Comment Note—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

3. **Jury § 7.11 (NCI3d)— first degree murder—jury selection— excusal for cause—procedure**

The trial court did not err during jury selection for a murder trial by allowing the State's challenges for cause without question, but on two occasions denying defendant's challenges for cause after an inquiry into whether the juror in question could follow the law as instructed. The record indicates that each of the State's challenges for cause based on the jurors' death penalty beliefs was proper, and in the two instances when the court inquired into the substance of defendant's challenges for cause, the court merely clarified and explained the law to a confused juror. Defendant was permitted to resume questioning in each instance and ultimately exercised peremptory challenges.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

4. **Jury § 7.12 (NCI3d)— first degree murder—jury selection— facts under which juror would invoke death penalty—improper**

The court did not err in a murder prosecution by sustaining the State's objections to defendant's questions asking prospective jurors to describe the circumstances under which they would invoke the death penalty. Just as counsel may not stake out prospective jurors by positing facts and inquiring into their decision on those facts, neither may they seek to have a juror supply a hypothetical set of facts necessary to support a particular verdict. There was also no error in sustaining

an objection to defendant's question as to whether a prospective juror thought the death penalty should be invoked in most cases; although it does not have the same tendency to stake out a juror, it was unnecessary for the effective use of defendant's challenges.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

5. **Jury § 6.3 (NCI3d)— first degree murder — jury selection — questions as to racial bias**

There was no violation of *Turner v. Murray*, 476 U.S. 28, in a first degree murder prosecution because the case involved neither an interracial crime nor a refusal by the trial court to allow defendant to question prospective jurors regarding racial bias.

**Am Jur 2d, Jury § 284.**

**Racial, religious, economic, social, or political prejudice of proposed juror as proper subject of inquiry or ground of challenge on voir dire in criminal case. 54 ALR2d 1204.**

6. **Jury § 7.7 (NCI3d)— first degree murder — jury selection — challenge for cause — not renewed — not preserved for appeal**

The trial court did not err in a murder prosecution by denying defendant's challenge for cause to two prospective jurors where defendant did not renew his challenges for cause as required by N.C.G.S. § 15A-1214(h)(i). Furthermore there was no abuse of discretion in denying the challenges for cause where one juror, while first indicating that he would tend to believe a law enforcement officer before other witnesses, further indicated that he would consider a number of factors in determining the credibility of law enforcement officers and the other juror, while first indicating that he would invoke the death penalty solely on the basis of a conviction of first degree murder, indicated after an explanation of the law by the court that he would not automatically recommend a sentence of death and that he would follow the law and listen to the evidence in the penalty phase.

**Am Jur 2d, Jury §§ 285, 289, 290, 299.**

7. **Homicide § 21.5 (NCI3d)— first degree murder—sufficiency of evidence**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to dismiss for insufficient evidence where the evidence indicated that defendant had the motive, opportunity, means and state of mind necessary to commit a first degree murder. The evidence was more than sufficient to allow a reasonable inference that defendant in fact committed the murder.

Am Jur 2d, Homicide §§ 425, 426, 437, 440.

8. **Criminal Law § 382 (NCI4th)— first degree murder— questioning of witness by judge—no error**

The trial court did not err in a first degree murder prosecution by questioning three State's witnesses where the court properly used its authority under N.C.G.S. § 8C-1, Rule 614(b) to question witnesses in order to clarify ambiguous testimony and to enable the court to rule on the admission of certain exhibits.

Am Jur 2d, Trial § 88.

9. **Homicide § 15 (NCI3d)— first degree murder—character of victim—no prejudicial error**

There was no prejudicial error in a first degree murder prosecution where the trial court admitted a witness's opinion as to the victim's reputation in the community before there was a challenge to the victim's character and when there was no evidence that the victim was the aggressor. Although the evidence against defendant was not overwhelming, exclusion of the testimony would not have likely changed the result.

Am Jur 2d, Homicide §§ 301, 308.

10. **Constitutional Law § 370 (NCI4th)— first degree murder— guilt phase—evidence of victim's character—no violation of constitutional rights**

There was no violation of a first degree murder defendant's rights under the Eighth Amendment to the United States Constitution from the admission during the guilt phase of a statement by one witness, unrelated to the victim, that the victim was a good man who helped people. There is no reasonable likelihood that this evidence created an unaccept-

able risk that the jury would arbitrarily and capriciously sentence defendant to death.

**Am Jur 2d, Homicide §§ 301, 308.**

11. **Criminal Law § 169.6 (NCI3d) — first degree murder — defendant's questions as to character of victim — excluded — no offer of proof**

A murder defendant's assignment of error to the exclusion of rebuttal evidence concerning the victim's good character was overruled where the record does not reveal what the witness's answer would have been.

**Am Jur 2d, Appeal and Error § 526; Evidence §§ 128-130; Homicide §§ 301, 302.**

12. **Homicide § 30 (NCI3d) — second degree murder — not submitted — no error**

The trial court did not err in a first degree murder prosecution by failing to submit defendant's requested instruction on second degree murder where there was no evidence that decedent was killed other than in the course of the commission of the felony of armed robbery.

**Am Jur 2d, Homicide § 530.**

13. **Criminal Law § 60.3 (NCI3d) — first degree murder — testimony of fingerprint expert — verification by another agent**

The trial court did not err during a first degree murder prosecution by allowing an SBI agent to testify that another agent had verified his identification of defendant's fingerprint. The trial court sustained defendant's objection and defendant did not move to strike the testimony, and there was no prejudice inasmuch as the witness gave his own uncontroverted opinion identifying the print. Moreover, it has been held in *State v. Jones*, 322 N.C. 406, that an SBI agent may tell the jury that another agent subsequently verified the match when testifying about standard SBI procedures. The challenged testimony is admissible to establish the basis for expert testimony, a nonhearsay purpose.

**Am Jur 2d, Expert and Opinion Evidence §§ 279, 280.**

**Fingerprints, palm prints, or bare footprints as evidence. 28 ALR2d 1115.**

STATE v. QUICK

[329 N.C. 1 (1991)]

**14. Criminal Law § 169 (NCI3d) — first degree murder — blood-stain on bicycle — admissible**

The trial court did not err in a first degree murder prosecution by denying defendant's pretrial motion to exclude evidence of a stain on a bicycle seized from defendant's residence. The court sustained defendant's objection, defendant failed to move to strike the testimony, defendant elicited similar evidence on cross-examination, and the same evidence came in later without objection.

**Am Jur 2d, Evidence § 425; Trial § 178.**

**15. Criminal Law § 1344 (NCI4th) — first degree murder — aggravating circumstances — especially heinous, atrocious, or cruel — evidence sufficient**

There was sufficient evidence at a sentencing hearing for first degree murder to support the submission of the especially heinous, atrocious, or cruel aggravating factor where defendant went to the victim's house when the victim was alone; the victim was a seventy-eight-year-old man who had undergone heart surgery and suffered a ruptured appendix; practically helpless, the victim temporarily fended off defendant's attack, but ultimately suffered seventeen stab wounds in the chest, abrasions on the face, bruises and lacerations around the mouth, and bruises and incisions on the forearm; seven or eight wounds extended through the heart and penetrated the left lung; two wounds went through the heart and into' the right lung; and there was testimony that the victim could have lived up to ten minutes after sustaining the stab wounds.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 552, 554, 555.**

**16. Criminal Law § 1352 (NCI4th) — first degree murder — sentencing — McKoy error**

A first degree murder defendant was entitled to a new sentencing hearing under *State v. McKoy,* 327 N.C. 31, where the court instructed the jury to answer no to each mitigating circumstance that it failed to find unanimously. The error was prejudicial because the jury rejected five of the six mitigating factors submitted and the defendant presented substantial evidence in support of at least some of those mitigating circumstances.

STATE v. QUICK

[329 N.C. 1 (1991)]

**Am Jur 2d, Criminal Law § 600.**

**Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

Justice MEYER concurring in part and dissenting in part.

Justices MITCHELL and MARTIN join in this concurring and dissenting opinion.

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by *Washington, J.*, at the 24 August 1987 Criminal Session of Superior Court, RICHMOND County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 10 December 1990.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was convicted of first-degree murder on the basis of premeditation and deliberation and felony murder. He also was convicted of robbery with a dangerous weapon. The jury recommended that defendant be sentenced to death for the first-degree murder. The trial court imposed a sentence of death for the murder and arrested judgment on the robbery charge. We find no prejudicial error in the guilt phase of defendant's trial, but conclude that defendant is entitled to a new sentencing proceeding under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

Between 4:30 and 5:00 a.m. on Sunday, 5 April 1987, William Patterson left his house in Hamlet, North Carolina, to find a soft drink for his sick daughter who was complaining of thirst. Patterson went to a store where a vending machine normally was located and found that the machine had been moved. Because Patterson had been drinking, he went to Charlie Mack Quick's house instead of driving into Hamlet for the soft drink. Quick, who apparently was unrelated to defendant, lived two or three miles from Patterson. When Patterson got to Quick's house the lights were off, but the front door was open slightly. Quick did not respond to Patterson's

call and Patterson then saw Quick's arm "laying out on the floor." Patterson went to the police station and told the police he thought Quick had suffered a heart attack.

At about 6:00 a.m. Richmond County Deputy Sheriff Stokes arrived at Quick's house. He entered the house and discovered Quick's dead body on the floor, lying on a telephone that was off its receiver; Quick's billfold, containing personal papers but no cash, lay nearby.

State Bureau of Investigation Agent Snead found no sign of forced entry when he arrived at the victim's house at about 7:00 a.m. Agent Sweatt, who arrived at the crime scene later in the day, removed nine latent fingerprints from an ashtray found just a few feet from the victim's body. One fingerprint matched defendant's ring finger; none of the other fingerprints from the ashtray matched defendant's, and there were no other fingerprints of value in the house. Agent Snead found bicycle tracks outside the victim's house, but was unable to make a cast from the tracks. Snead testified, however, that the tracks found outside the victim's house had the same width and tread design as tracks found in the yard of Willis Bristoe.

The autopsy of the victim's body revealed seventeen stab wounds in the chest area and bruises on the forearm. In the medical examiner's opinion, the victim died from multiple stab wounds and the resulting loss of blood. The victim might have lived as long as ten minutes after the first stab, but it was impossible to say exactly how long he lived. The medical examiner testified that the depth of the wounds ranged from three and one-half to six inches and that the wounds could have been made by a pocketknife. The depth of the wounds was consistent with a single-edge knife blade approximately three and one-half inches long.

The victim was a seventy-eight-year-old disabled man who lived alone. His cousin, Gertha Mumfort, testified that she saw him several days each week and she knew he received two checks from the government in the mail, one on the first and one on the third day of each month. She also testified that the victim usually carried several one hundred dollar bills in his wallet. Mumfort testified that she last saw the victim on 3 April 1987.

Julian Hunsucker testified that between noon and 1:30 p.m. on 4 April 1987, the victim came to the neighborhood store where

Hunsucker worked. Hunsucker testified that the victim showed him $800.00 in one hundred dollar bills; the victim always carried money and never asked for credit at the store.

Patricia Sturgess, a part-time worker with the Department of Social Services, testified that she spoke on the telephone with the victim sometime between 5:30 and 6:00 p.m. on 4 April 1987. Sturgess testified that she heard other voices in the background but could not tell if they were male or female. Sturgess gave her opinion that at the time the victim did not sound normal. Mary Davis, the victim's daughter, received a busy signal when she attempted to call the victim at about 7:00 p.m. on 4 April 1987. Likewise, Willie Dawkins testified that the line was busy when he tried to call the victim between 7:00 and 7:30 p.m. on April 4th.

On 6 April 1987, police officers went to Karel Company, defendant's place of employment, to speak with him. Defendant voluntarily accompanied the officers to police headquarters. During an interrogation there, defendant said that on the day in question he had ridden a bicycle to a store around noon and later had gone to his cousin's house to play cards. Defendant said he had never been to the victim's house. During this interrogation, the police received a telephone call notifying them that defendant's fingerprint was on the ashtray found at the victim's house. The officers then arrested defendant.

Willis Bristoe testified that on the afternoon of Saturday, 4 April 1987, he went with defendant and several others to visit a friend. Bristoe testified that they returned to his house and that defendant left on his bicycle at about 5:00 p.m. Bristoe said that he loaned defendant eighty-four cents to buy cigarettes.

Verlie Williams testified that defendant, his girl friend, and his mother came to her home for a card game between 8:30 and 10:00 p.m. on Saturday, 4 April 1987. Defendant bought two beers and paid for them with a twenty dollar bill. Williams testified that defendant came back to her home the next morning, 5 April 1987, between 11:00 a.m. and noon, and bought three beers.

Boyd Goodman, a disc jockey at a local club, testified that he remembered seeing defendant playing cards on 3 April and 5 April. He also testified that defendant purchased a beer the evening of 5 April with a one hundred dollar bill.

STATE v. QUICK

[329 N.C. 1 (1991)]

James Patterson worked for Karel Company in April 1987. Patterson testified that he had known defendant for several years and that defendant had asked him to sharpen a knife during the week before the victim's death. The knife Patterson sharpened for defendant had two blades — one was three inches long; the other was two or two and one-half inches long. Patterson testified that many people carry such knives and that he had sharpened knives for others on previous occasions.

Harold McRae, who met defendant while they were both incarcerated, testified that defendant approached him while in jail and wanted to talk. McRae testified that defendant told him he killed a man. According to McRae, defendant said he rode his bicycle to the man's house around midnight. Defendant said he knocked on the door, then went inside looking for money. When the man inside recognized defendant, defendant stabbed him and took $1,300 and a gun. Defendant rode his bicycle home, and later buried the gun and knife. McRae also testified that defendant said he did not mean to kill the victim.

Defendant's evidence tended to show the following: Anthony Snyder, who was in jail with defendant and McRae, testified that he spoke with defendant every day they were incarcerated, and defendant never spoke about his case to anyone. Snyder also said McRae had been threatened with beatings by several of the prison guards.

James Davis testified that he saw defendant around 6:00 or 6:15 p.m. on 4 April. Davis said defendant was riding in his father's car with his brothers; Davis also said he saw a bicycle in the back of the car.

Charles Quick, defendant's brother, saw defendant on the evening of 3 April. Quick testified that defendant had a "little light roll" of money. Quick also testified that he saw defendant's bicycle with a flat tire on 4 April. Willis Bristoe corroborated the testimony regarding the bicycle's flat tire.

Harold Fisher testified that he saw the victim on the afternoon of 4 April. Fisher said the victim told him defendant had been to his house the previous night, but had not come inside. Gail Jackson, defendant's girl friend, also testified that she and defendant went to the victim's house on 3 April and that defendant

smoked a cigarette while they were there. Jackson testified that she gave defendant $150.00 on the first of April.

Defendant testified in his own behalf and denied killing the victim. Defendant said he was paid $53.00 on 3 April 1987. Later that evening, he and his girl friend visited several friends, including the victim. Defendant testified that he smoked a cigarette while at the victim's house. The next day he rode his brother's bicycle to see several people. During the day he noticed the tire was going flat. His brother came to pick him up and they took the bicycle home around 6:00 p.m. He stayed at home until about 11:30 p.m. the evening of 4 April, when he went to Verlie Williams' house to play cards.

Johnnie Quick, defendant's supervisor at Karel Company, testified that defendant was a "real good worker" with a good record of attendance. Terry Warner, a psychologist at Sandhills Mental Health Center, testified that defendant had an IQ of seventy-four (borderline range of intellectual functioning). This IQ made defendant less capable of making reasoned decisions and performing tasks requiring verbal behavior. In addition, defendant's substance abuse compromised the limited abilities he had. Warner testified that defendant tended to be impulsive as opposed to acting with thoughtful contemplation. Warner also testified that defendant knew the difference between right and wrong.

I

[1] Defendant's first assignment of error concerns the removal of prospective jurors following their responses to questions regarding the death penalty. Following a preliminary inquiry into prospective jurors' feelings about the death penalty, the trial court excused three jurors for cause. Likewise, the court allowed the State to excuse for cause eleven other prospective jurors upon the same grounds. Defendant contends that none of these prospective jurors was asked if he or she could set aside personal feelings about capital punishment and follow the law of North Carolina. Defendant contends that the trial court neither allowed him to examine these prospective jurors before their removal, nor undertook its own inquiry into the jurors' suitability to sit on the case. Yet, defendant argues, the court did attempt to rehabilitate two prospective jurors whom defendant sought to challenge for cause. Defendant thus argues that he is entitled to a new trial because prospective jurors

were excused for cause improperly and because the trial court was not evenhanded during jury selection.

The United States Supreme Court has described the standard for determining whether a prospective juror in a capital case has been excused improperly as "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). *Witt* also stated that, in jury selection, "the quest is for jurors who will conscientiously apply the law and find the facts" and that "it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Id.* at 423, 83 L. Ed. 2d at 851. Finally, *Witt* noted that the *Adams* standard "does not require that a juror's bias be proved with 'unmistakable clarity,'" *id.* at 424, 83 L. Ed. 2d at 852, and that the trial judge's decision to excuse a juror is entitled to deference because "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425-26, 83 L. Ed. 2d at 852.

Our review of the jury selection voir dire leads us to conclude that the trial court did not err in excusing three prospective jurors for cause. Nor did the court err in allowing the State to excuse eleven other prospective jurors for cause.

Before addressing prospective jurors individually, the trial court gave preliminary instructions describing the charges against defendant, the presumptions and burdens belonging to the parties, and the nature of the procedures to be followed in the trial. The court made certain the prospective jurors understood that this was a capital trial consisting of two stages and that during the sentencing stage, if reached, the jury would consider evidence of aggravating and mitigating circumstances before recommending a sentence. The court also asked the prospective jurors collectively if they would follow the law of North Carolina. All prospective jurors indicated that they understood the court's instructions and could follow the law. The court then asked:

[D]o any of the members of this jury now have personal beliefs about the death penalty that are so strongly held that no matter what the evidence, no matter what the circumstances

> are proven to the jury, that you would be unable to vote for a recommendation of the death penalty even though you were satisfied beyond a reasonable doubt of the three things required by law that I have mentioned to you.

One juror raised his hand. The court, uncertain whether the jurors had understood the question, asked again:

> If this defendant is convicted by a jury, of which you are a part, of First Degree Murder, can and will you follow the law of North Carolina as to the sentence recommendation as the Court will explain to you, or because of your personal beliefs about the death penalty, would you be unable to vote for a recommendation of the death penalty even though you were satisfied beyond a reasonable doubt of the the three things required by law [the existence of aggravating circumstances that outweigh the mitigating circumstances and are sufficiently substantial to call for the imposition of the death penalty].

When potential juror ten again raised his hand, the court asked, "you are saying that you could not apply the law of North Carolina to this evidence, and if you . . . found this defendant guilty of Murder in the First Degree, under no circumstances could you vote for the death penalty; is that correct?" The juror answered: "That's correct." The court asked defense counsel and counsel for the State if they had questions for this juror; both responded negatively. The court then excused the juror for cause.

The clerk of court then called a replacement juror who also declared an inability to follow North Carolina's capital sentencing law. Defense counsel again had neither questions for the juror nor an objection to his excusal.

The court asked the next replacement juror, "As to the second phase of this trial then, do you say you could and would follow the law as to the imposition of the death penalty?" The juror responded: "No, sir." The court asked again: "You are saying that no matter what the law is, or how strong the evidence is, under no circumstances would you vote for the death penalty; is that what you are saying?" The juror answered: "Yes." The court then excused the juror without objection by defendant. These three jurors properly were excused by the court under the test in *Witt* described above.

During jury selection, the State excused for cause eleven prospective jurors based on their responses to death penalty questioning. As to nine of these prospective jurors, defendant failed to object. The Court in *Witt* indicated that failure of defense counsel to object to the removal of a prospective juror was a circumstance bearing directly on the question of whether the removal was proper. *Id.* at 431n.11, 83 L. Ed. 2d at 856n.11. Our review of the transcript leads us to conclude that, in fact, the removal of these prospective jurors was proper. In each instance where defendant failed to object, the prospective juror in question indicated that regardless of the facts or law he or she would not consider the death penalty. In one of the instances where defendant did object to the removal of a prospective juror, the juror responded that under no circumstances would she consider the death penalty, regardless of the facts or law. In the other instance where defendant objected, the juror stated: "There is no way I can sentence a person to death." The juror said she could not consider the death penalty no matter how aggravated the case was and regardless of the facts.

Though the trial court did not inquire expressly whether each juror's beliefs about the death penalty would "substantially impair the performance of his duties as a juror," the answers of each juror indicate such impairment. There is no indication in the record that any of the challenged jurors would have given different answers if the court had conducted a more detailed inquiry into their beliefs regarding the death penalty. *See State v. Reese*, 319 N.C. 110, 121, 353 S.E.2d 352, 358 (1987).

[2] Defendant also argues that the trial court erred by not giving him the opportunity to question or attempt to rehabilitate the challenged jurors. We have held consistently that there is no right to question or rehabilitate a juror in a capital case when the juror has expressed a clear and unequivocal refusal to impose the death penalty under all circumstances. *State v. Johnson*, 317 N.C. 343, 376, 346 S.E.2d 596, 614 (1986); *State v. Smith*, 291 N.C. 505, 526-27, 231 S.E.2d 663, 676-77 (1977); *State v. Bock*, 288 N.C. 145, 156, 217 S.E.2d 513, 520 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1209 (1976).

[3] Defendant's last argument under this assignment of error is that the trial court acted partially during jury selection by allowing the State's challenges for cause without question, yet on two occa-

STATE v. QUICK

[329 N.C. 1 (1991)]

sions denying defendant's challenges for cause after an inquiry into whether the juror in question could follow the law as he was instructed. Without doubt, the trial court must act impartially during a trial. *See, e.g., State v. Frazier*, 278 N.C. 458, 460, 180 S.E.2d 128, 130 (1971); N.C.G.S. § 15A-1232 (1988). As discussed above, the record indicates that each of the State's challenges for cause based on a juror's beliefs regarding the death penalty was proper, even absent inquiry by the trial court. In the two instances when the court inquired into the substance of defendant's challenges for cause, the court merely clarified and explained the law when the prospective juror was confused by the questioning. In each instance, defendant was permitted to resume questioning following the court's inquiry. Defendant ultimately exercised peremptory challenges to remove the two jurors he sought to challenge for cause. We conclude that the trial court properly conducted the jury selection so as to insure that both defendant and the State would have a fair and impartial jury. *See State v. Artis*, 325 N.C. 278, 295, 384 S.E.2d 470, 479 (1989), *vacated and remanded on other grounds*, --- U.S. ---, 108 L. Ed. 2d 604 (1990). Defendant is not entitled to relief under this assignment of error.

[4] Defendant's next assignment of error concerns the trial court's limitations on defendant's jury selection voir dire. During jury selection, the court apparently sustained the State's objection when defendant asked a prospective juror, "[u]nder what circumstances would you invoke the death penalty?" The court also sustained the State's objection when defendant sought to ask another prospective juror whether the death penalty should be imposed in most cases. Defendant contends that, by sustaining the State's objections to these questions, the court prevented defendant from using his challenges knowingly and intelligently, thereby denying his constitutional rights to a fair trial, due process of law, and the heightened degree of reliability demanded in capital cases.

We note first that "[t]he trial judge has broad discretion in supervising the selection of the jury to the end that both the state and defendant may receive a fair trial." *State v. Nelson*, 298 N.C. 573, 593, 260 S.E.2d 629, 644 (1979), *cert. denied sub nom. Jolly v. North Carolina*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980) (citing *State v. McKenna*, 289 N.C. 668, 224 S.E.2d 537, *death sentence vacated*, 429 U.S. 912, 50 L. Ed. 2d 278 (1976)). "Moreover, in order to establish reversible error, a defendant must show prejudice in addition to a clear abuse of discretion on the part of the

trial court." *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989).

We have held consistently that "[t]he trial court should not permit counsel to question prospective jurors as to the kind of verdict they would render or how they would be inclined to vote on a given state of facts." *State v. Bracey*, 303 N.C. 112, 119, 277 S.E.2d 390, 395 (1981); *see also State v. Parks*, 324 N.C. at 423, 378 S.E.2d at 787; *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980). Just as counsel may not "stake out" prospective jurors by positing certain facts and inquiring into their probable decision on those facts, neither may they seek to have a juror supply a hypothetical set of facts necessary to support a particular verdict. Thus, the court did not abuse its discretion by precluding defendant from asking a prospective juror to describe the circumstances under which he would invoke the death penalty.

Neither did the court commit reversible error by sustaining an objection to defendant's question whether a prospective juror thought the death penalty should be invoked in most cases. Though this question does not have the same tendency to stake out a juror to a particular position, it was unnecessary for the defendant's effective use of his challenges. Defendant was allowed to ask the prospective juror whether she believed the death penalty should automatically be invoked in first-degree murder cases. He also was able to ask about the degree to which the juror thought about or discussed the death penalty. Defendant ultimately exercised a peremptory challenge to remove this juror. Defendant is unable to show that the court's ruling was an abuse of discretion or that it prejudiced his ability to secure an impartial jury.

[5] Defendant also argues that the court's rulings violated the United States Supreme Court's decision in *Turner v. Murray*, 476 U.S. 28, 90 L. Ed. 2d 27 (1986). In *Turner*, the Court held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.* at 36-37, 90 L. Ed. 2d at 37. This case involves neither an interracial crime nor a refusal by the trial court to allow defendant to question prospective jurors regarding racial bias. We find no special circumstance creating an unacceptable risk that defendant would receive the death penalty arbitrarily or capriciously. Defendant is not entitled to relief on this assignment of error.

**[6]**  Defendant next assigns as error the trial court's denial of defendant's challenges for cause to prospective jurors Ballentine and Estridge. We note at the outset that defendant, by failing to renew his challenges for cause, has failed to comply with N.C.G.S. § 15A-1214(h) and (i). These provisions require that:

> (h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:

>> (1) Exhausted the peremptory challenges available to him;

>> (2) Renewed his challenge as provided in subsection (i) of this section; and

>> (3) Had his renewal motion denied as to the juror in question.

> (i) A party who has exhausted his peremptory challenges may move orally or in writing to renew a challenge for cause previously denied if the party either:

>> (1) Had peremptorily challenged the juror; or

>> (2) States in the motion that he would have challenged that juror peremptorily had his challenges not been exhausted.

N.C.G.S. § 15A-1214(h), (i) (1988). Compliance with these provisions is a mandatory predicate to defendant's right to assert this argument on appeal. *State v. Sanders*, 317 N.C. 602, 608, 346 S.E.2d 451, 455 (1986). Thus, defendant has not preserved this issue for appellate review.

Further, the trial court's ruling on a challenge for cause will not be overturned absent abuse of discretion. *See State v. Kennedy*, 320 N.C. 20, 26, 357 S.E.2d 359, 363 (1987); *State v. Watson*, 281 N.C. 221, 227, 188 S.E.2d 289, 293, *cert. denied*, 409 U.S. 1043, 34 L. Ed. 2d 493 (1972). Even if defendant had complied with the statute, he is not entitled to relief under this assignment because he has not shown an abuse of discretion.

Defendant sought to challenge prospective juror Ballentine for cause because Ballentine had served previously on a grand jury before which Captain Jarrell, one of the State's witnesses in this case, appeared as a witness. Ballentine also said at one point that

he "believe[d] he would" tend to believe an officer before other witnesses. Yet, in response to an almost identical question Ballentine said he "[would] have to consider it all" before deciding whether the testimony of a law enforcement officer would receive more weight than that of any other witness. Ballentine also said he did not know whether it would take more evidence from defendant to "overcome [his] belief of what the officer said."

Upon defendant's challenge for cause, the court inquired into whether Ballentine understood that he could believe all, part, or none of what a witness said; the court also reminded Ballentine of the law on reasonable doubt and the State's burden of proof. Satisfied that Ballentine would follow the law and not automatically give undue credence to testimony by officers, the court denied the challenge for cause. Defendant then asked Ballentine again whether he would give more weight to the testimony of an officer than to that of other witnesses. Ballentine's response was: "It's according to how it all comes about." Ballentine's answers indicated that he would consider a number of factors in determining the credibility of law enforcement officers. In light of those answers, there was no abuse of discretion in denying the challenge for cause as to prospective juror Ballentine.

Likewise, defendant challenged prospective juror Estridge because he indicated that he would invoke the death penalty even though the sole basis for the sentence was a conviction of first-degree murder. Yet, when defense counsel asked whether Estridge would consider any other verdict, Estridge replied: "I would give consideration to what the facts are in this case." When defendant challenged Estridge for cause, the court explained the difference between the guilt and penalty phases of the trial. The court then asked Estridge whether he would automatically vote for the death penalty if the jury found defendant guilty of first-degree murder. Estridge responded that he would not automatically recommend a sentence of death and that he would follow the law and listen to the evidence in the penalty phase. Defendant has failed to show an abuse of discretion by the trial court. This assignment of error is without merit.

II

[7] With respect to the guilt phase of the trial, defendant first assigns as error the trial court's denial of his motion to dismiss the first-degree murder charge for insufficiency of the evidence.

Defendant contends that there was insufficient evidence that it was he who killed the victim, that he killed with premeditation and deliberation, or that he killed while engaged in an armed robbery.

In *State v. Small*, 328 N.C. 175, 400 S.E.2d 413 (1991), we described the appropriate standard of review as follows:

> "On a motion to dismiss on the ground of insufficiency of the evidence, the question for the court is whether there is substantial evidence of each element of the crime charged and of the defendant's perpetration of such crime." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983).

> [T]he trial court must view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it. . . . If there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.

> *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988) (citations omitted). Further, "[t]he defendant's evidence, unless favorable to the State, is not to be taken into consideration." *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971). The determination of the witnesses' credibility is for the jury. *See Locklear*, 322 N.C. at 358, 368 S.E.2d at 383. "[C]ontradictions and discrepancies do not warrant dismissal of the case — they are for the jury to resolve." *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982).

*Id.* at 180-81, 400 S.E.2d at 415-16. "The trial court's function is to determine whether the evidence will permit *a reasonable inference* that the defendant is guilty of the crimes charged." *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) (emphasis in original).

Under this standard, there was sufficient evidence that defendant killed the victim with premeditation and deliberation and during the course of an armed robbery. The State presented evidence of defendant's fingerprint on an ashtray found inside victim's house. Harold McRae testified that defendant approached him while they were in jail together and told him defendant had ridden a bicycle to the victim's house, gone inside looking for money, stabbed the

victim to death, taken approximately $1,300, and then left. The State also presented evidence that the size and shape of defendant's recently sharpened pocketknife was consistent with the victim's wounds.

When determining whether there is sufficient evidence that a killing was done with premeditation and deliberation, the court may consider several circumstances, including the following: (1) want of provocation on the part of the deceased; (2) the conduct and statements of defendant before and after the killing; (3) the dealing of lethal blows after the deceased has been felled and rendered helpless; (4) evidence that the killing was done in a brutal manner; and (5) the nature and number of the victim's wounds. *See State v. Vause*, 328 N.C. at 238, 400 S.E.2d at 62; *State v. Bullock*, 326 N.C. 253, 258, 388 S.E.2d 81, 84 (1990). These circumstances are present here. Harold McRae testified that defendant said he stabbed the victim when the victim recognized him. This testimony permitted a reasonable inference that defendant stabbed the victim to avoid identification rather than because he was provoked. The brutality of the killing is shown by the infliction of seventeen stab wounds on the victim and the testimony by Agent Snead that the walls of the victim's house were splattered with blood. The number of wounds permits a reasonable inference that the seventy-eight-year-old victim received lethal blows after being felled and rendered helpless. Agent Snead testified that when he interrogated defendant about the killing, defendant "acted like I was talking about the weather."

There was also sufficient evidence to show that the killing occurred during an armed robbery. The State introduced evidence that defendant was borrowing money, even very small amounts, from friends to pay for cigarettes and beer during the two days before the murder. There was evidence that it was common knowledge that the victim carried large amounts of money on his person, including one hundred dollar bills. There was evidence that the victim's billfold was empty when found at the murder scene and that defendant was in possession of a significant amount of money, including a one hundred dollar bill, the day after the murder. Finally, there was evidence that defendant possessed a knife consistent with the murder weapon and that defendant hid or buried the knife after commission of the crime.

Defendant argues that the evidence against him in this case is no stronger than that in other cases in which courts' have dismissed charges. *See State v. Lee*, 294 N.C. 299, 240 S.E.2d 449 (1978); *State v. Chapman*, 293 N.C. 585, 238 S.E.2d 784 (1977); *State v. White*, 293 N.C. 91, 235 S.E.2d 55 (1977); *State v. Jones*, 280 N.C. 60, 184 S.E.2d 862 (1971); *see also State v. Bell*, 65 N.C. App. 234, 309 S.E.2d 464 (1983), *aff'd per curiam*, 311 N.C. 299, 316 S.E.2d 72 (1984). In none of the cases cited was there evidence of a statement by the defendant admitting the act and providing details of the offense. This case is more like *State v. Ledford*, 315 N.C. 599, 340 S.E.2d 309 (1986). In *Ledford*, we rejected the defendant's challenge to the sufficiency of the evidence where there was evidence that the defendant's shoe matched a footprint at the murder scene, that cigarette butts taken from defendant's home were the same brand as cigarette butts found at the murder scene (the nonsmoking victim's bedroom), and that defendant possessed money at the time of his arrest that corresponded to the money missing from the victim's home. *See also State v. Stone*, 323 N.C. 447, 373 S.E.2d 430 (1988).

The evidence recited above indicates that defendant had the motive, opportunity, means, and state of mind necessary to commit first-degree murder. The evidence was more than sufficient to allow a reasonable inference that defendant in fact committed the murder. Therefore, defendant is not entitled to relief on this assignment of error.

**[8]** Defendant next contends that the trial court committed reversible error by questioning three of the State's witnesses in a manner that implicitly expressed an opinion about the case to the jury. Defendant argues that such questioning by the trial court violated his federal and state constitutional rights and entitles him to a new trial.

The trial court is permitted to "interrogate witnesses, whether called by itself or by a party," N.C.G.S. § 8C-1, Rule 614(b), but the court may not "express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988); *see also* N.C.G.S. § 8C-1, Rule 614(b), commentary; N.C.G.S. § 1A-1, Rule 51(a) (1990). However, "[i]n fulfilling the duties of a trial judge to supervise and control the course of a trial so as to insure justice to all parties, the judge may question a witness in order to clarify confus-

ing or contradictory testimony." *State v. Ramey*, 318 N.C. 457, 464, 349 S.E.2d 566, 571 (1986).

During the first episode about which defendant complains, the court asked:

THE COURT: Mr. Witness, let me clarify something for myself, at least.

You talked about sharpening a knife. Did you sharpen one knife or two knives?

WITNESS: For him?

THE COURT: For him.

WITNESS: I only sharpened one.

THE COURT: Did that knife have one blade or two blades?

WITNESS: It had two.

THE COURT: It had two. One blade you referred to as being 2 or 2½ inches long; is that right?

WITNESS: That's right.

THE COURT: And the other blade you referred to as being maybe 3 inches long; is that right?

WITNESS: Yes sir.

The court's express purpose in questioning as it did was to clarify whether the witness was referring to one knife with two blades or two knives with one blade each. In no way did the questioning express the court's opinion as to the evidence.

When Agent Snead testified on direct examination for the State regarding a photograph of tire impressions made at Willis Bristoe's house, the record shows the following exchange:

MR. MEACHEM: Your Honor, the State would ask that the witness be allowed to step down and illustrate his testimony.

THE COURT: What photographs are you referring to?

MR. MEACHEM: Your Honor, the State is referring to the State's exhibits 15, 16, 17, and 18 that were just introduced.

THE COURT: The Court will ask a question with regard to State's exhibit 18.

## STATE v. QUICK

[329 N.C. 1 (1991)]

Mr. Witness, as to the photograph of the tire impression or prints, the photograph is the area of the Willis Bristoe residence. When was that photograph taken?

WITNESS: It was taken on the 5th of April, 1987.

THE COURT: The 5th of April?

WITNESS: Yes sir.

THE COURT: The same day that you observed impressions or tracks at the [victim's] home?

WITNESS: That's correct, Your Honor.

THE COURT: And the photograph marked as State's exhibit 18, as one looks at it in the lower right-hand corner there is some object. Do you know what that was?

WITNESS: I have no idea what that is.

THE COURT: It's a round object.

WITNESS: Yes sir. It has—

THE COURT: It appears to be a reddish brown color.

WITNESS: Yes sir.

Following defendant's objection to State's exhibit 18, the court instructed the jury that the photograph would be admitted solely to explain or illustrate the testimony of the witness. The court also instructed the jury that the parties had stipulated to the court that "with regard to the round or circular appearing reddish brown object in the lower corner of that photograph, the jury is instructed that that has no known significance to the question before the jury and the Court." It appears, then, that in questioning this witness the court was exercising its proper function in ruling on the admissibility of an exhibit. The court did not express an opinion about the evidence or the exhibit; in fact, the court went to considerable length to prevent improper testimony or speculation about the object in the photograph that was subject to the parties' stipulation.

The third episode of questioning by the court occurred following defendant's recross examination of Dr. Thorne, the medical examiner, as follows:

THE COURT: Dr. let me ask you one or two questions.
. . .

Q. If you assume that a person is standing erect, perpendicular to the floor—

A. Yes sir.

Q. —now, a knife wound, a stab wound can go straight in roughly parallel to the floor, it can go upwards or it can go downwards?

A. Yes.

Q. Did you make any determination as to the path of the wound that you observed or examined on the body of Charlie Mac Quick?

A. Yes, I did.

Q. What was your finding?

A. My summary of the wounds was that the tracks were from front to back. Predominately from the right to the left and down.

Q. And down?

A. Yes sir.

Q. You found . . . wounds ranging upwards then?

A. In my report all of them were predominately down.

Q. Do you have any way of determining the position of the body at the. time the wounds were inflicted, whether it was standing up, sitting down or lying down, or anything else?

A. No sir. That would be impossible to do.

THE COURT: I have no further questions. If you gentlemen wish to ask additional questions, you may do so.

Here again, the court communicated no opinion about the evidence. It merely sought to clarify the procedures used during the autopsy and the actual findings regarding the range of the wounds. The court also allowed the parties to rebut or explore any new evidence that resulted from its questioning. Finally, in its instructions to the jury at the close of the guilt phase, the court said:

The law, as indeed it should, does not allow the judge presiding over the trial to tell the jury what it should do, or how to think. I have no right to do that, and I would not attempt to tell you how to decide this case. That is your

sole duty and responsibility. You are the judges of the facts and you alone decide the issues for or against this defendant.

Our examination of the record leads us to conclude that the trial court did not question the State's witnesses in a manner that communicated to the jury the court's opinion about evidence in the case. Rather, the court properly used its authority under Rule 614(b) to question witnesses in order to clarify ambiguous testimony and to enable the court to rule on the admissibility of certain evidence and exhibits. We find no violation of defendant's state or federal constitutional rights. This assignment of error is without merit.

[9] Defendant next claims the trial court erred in overruling his objection to inadmissible evidence of the victim's good character and in preventing defendant from presenting rebuttal evidence that could have established a motive for persons other than defendant to kill the victim. On redirect examination, the prosecutor asked William Patterson, the neighbor who discovered the victim's body, if he knew the victim's "reputation in the community." Patterson answered "Yes" and defendant objected when the prosecutor sought to have Patterson describe the victim's reputation. The trial court overruled defendant's objection and Patterson said: "To me he was a good man. He helped everybody out around there." On recross examination, defense counsel questioned Patterson about the victim's willingness to have couples come to his house for drinks. The court sustained the State's objection, however, when defense counsel asked Patterson if the victim "didn't have a reputation of ruining marriages in the community?"

Defendant first argues that the court erred in allowing the State to present evidence of the victim's good character. We agree, but find the error harmless. Rule 404(a)(2) governs the admissibility of evidence concerning the character of the victim. The rule states:

> (a) Character evidence generally.—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> . . . .
>
> (2) Character of victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or

> evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor . . . .

N.C.G.S. § 8C-1, Rule 404(a)(2) (1988). Thus, the rule allows the prosecution to introduce evidence of a victim's character only to rebut defendant's evidence calling it into question. At the time of Patterson's testimony, there had been no challenge to the victim's character and there was no evidence that the victim was the aggressor. The admission of the witness's opinion as to the victim's reputation in the community was therefore error.

"The admission of evidence which is technically inadmissible will be treated as harmless unless prejudice is shown such that a different result likely would have ensued had the evidence been excluded." *State v. Gappins*, 320 N.C. 64, 68, 357 S.E.2d 654, 657 (1987). Though the evidence against defendant was not overwhelming, we are convinced that exclusion of the witness's statement that the victim was a good man who helped people in the community would not likely have changed the result in this case. N.C.G.S. § 15A-1443(a) (1988).

[10] Defendant next argues that the admission of this evidence of the victim's good character violates his rights under the eighth amendment to the United States Constitution because it "is irrelevant to a capital sentencing decision, and . . . its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth v. Maryland*, 482 U.S. 496, 502-03, 96 L. Ed. 2d 440, 448 (1987). Likewise, under *South Carolina v. Gathers*, 490 U.S. 805, 104 L. Ed. 2d 876 (1989), evidence of the good qualities of a homicide victim in a capital sentencing proceeding is prohibited by the eighth amendment.

We conclude that the risks the Court found unacceptable in *Booth* and *Gathers* are not present here. In *Booth*, the Court found unconstitutional the admission of a victim impact statement during the sentencing phase of a capital trial. The statement contained relatively detailed descriptions of the effect of the crime on the victim and his family. The Court "reject[ed] the contention that the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics, are proper considerations in a capital case." *Booth*, 482 U.S. at 507, 96 L. Ed. 2d at 451. Here we have only an isolated statement during the guilt phase

by one witness, who was unrelated to the victim, that the victim was a good man and helped people. This does not present the dangers identified by the Court in *Booth*, where the victim-related evidence was far more extensive.

In *Gathers*, the Court upheld the decision of the Supreme Court of South Carolina that the prosecutor's " 'extensive comments to the jury [during closing argument] regarding the victim's character were unnecessary to an understanding of the circumstances of the crime[.]' " *Gathers*, 490 U.S. at 810, 104 L. Ed. 2d at 882 (quoting *State v. Gathers*, 295 S.C. 476, 484, 369 S.E.2d 140, 144 (1988) ). Again, the solitary comment by one witness in this case that the victim was a good and helpful man is clearly different from the "extensive comments to the jury" by the prosecutor in *Gathers*. There is no reasonable likelihood that this evidence created an unacceptable risk that the jury would arbitrarily and capriciously sentence defendant to death.

The Fifth Circuit Court of Appeals recently found an eighth amendment violation under *Booth* upon the introduction of evidence that the victim was a "fine person" and "would do anything he could to help anybody anywhere." *Rushing v. Butler*, 868 F.2d 800 (5th Cir. 1989). *Rushing*, however, is distinguishable in that there was additional "emotionally charged and inflammatory evidence of [the victim's] admirable personal characteristics and the extent of emotional distress suffered by [the victim's] family and friends." *Id.* at 804. In *Rushing* live witnesses tearfully testified in a eulogistic manner quite different from the matter-of-fact declarative statement at issue here. We find no violation of defendant's eighth amendment rights.

[11] Defendant's last argument under this assignment of error is that the trial court, having allowed the State to introduce evidence of the victim's good character, should have allowed defendant to rebut with evidence of the victim's reputation for ruining marriages. Defendant argues that the evidence he sought to introduce on cross-examination of witness Patterson was relevant in that it revealed a motive for people other than defendant to kill the victim. Finally, defendant argues that the trial court, by sustaining the State's objection to questions about the victim's reputation, violated his sixth amendment right to present evidence in his defense. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 94 L. Ed. 2d 40, 56 (1987).

STATE v. QUICK

[329 N.C. 1 (1991)]

Assuming that defendant was entitled to question witness Patterson in an attempt to rebut the evidence of the victim's good character, defendant has failed to show prejudice in that the record does not reveal what the witness's answer would have been. *See State v. Faircloth*, 297 N.C. 100, 112, 253 S.E.2d 890, 897, *cert. denied*, 444 U.S. 874, 62 L. Ed. 2d 102 (1979); *State v. Banks*, 295 N.C. 399, 410, 245 S.E.2d 743, 750 (1978); *State v. Little*, 286 N.C. 185, 189, 209 S.E.2d 749, 753 (1974). Likewise, absent an offer of proof, we cannot determine whether the excluded evidence was specific enough to be relevant evidence that some other party had a motive to kill the victim. *See State v. Cotton*, 318 N.C. 663, 667, 351 S.E.2d 277, 279 (1987). This assignment of error is overruled.

[12]  By his next assignment of error, defendant argues that he is entitled to a new trial because the trial court refused to submit his requested instruction on second-degree murder. In *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983), we held that

[i]f the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Id.* at 293, 298 S.E.2d at 658 (emphasis in original). Defendant argues that the testimony of Harold McRae, who was tendered by the State, that defendant did not mean to kill the victim negates the elements of premeditation, deliberation, and intent to kill, thereby supporting defendant's request for an instruction on second-degree murder.

Though McRae's testimony does tend to show absence of premeditation and deliberation, "where the law and the evidence justify the use of the felony murder rule, the State is not required to prove premeditation and deliberation . . . ." *State v. Rinck*, 303 N.C. 551, 565, 280 S.E.2d 912, 923 (1981). Further, as in *State v. Covington*, 290 N.C. 313, 226 S.E.2d 629 (1976), in this case

[a]ll of the evidence tended to show that the murder of [the victim] was perpetrated during the course of an armed robbery. Such a killing is murder in the first degree and the

trial judge was therefore not required to submit lesser included offenses to the jury for its consideration.

*Id.* at 346, 226 S.E.2d at 651. Stated another way, "[t]here is no evidence that decedent was killed other than in the course of the commission of the felony" of armed robbery. *State v. Rinck*, 303 N.C. at 565, 280 S.E.2d at 923. This assignment of error is without merit.

[13] Defendant next contends that he is entitled to a new trial because the trial court allowed SBI Agent Leonard, while testifying for the State, to introduce inadmissible hearsay. On direct examination, Leonard testified that he identified defendant's fingerprint on an ashtray found in the victim's home. Leonard also testified that, in accordance with SBI procedures, he asked Agent Duncan to verify the identification and that "[Duncan] agreed with the identification." At that point defendant objected and the trial court sustained the objection. Defendant argues that he is entitled to a new trial because Duncan's prejudicial opinion came in as substantive evidence for the truth of the matter asserted, *i.e.*, that the fingerprint matched defendant's, and not as the basis for Leonard's own expert opinion.

We reject this contention. First, where the trial court sustains defendant's objection, he has no grounds to except. *See State v. Sessoms*, 79 N.C. App. 444, 445, 339 S.E.2d 458, 459, *disc. rev. denied*, 316 N.C. 737, 345 S.E.2d 397 (1986) (no prejudice where defendant's objection was sustained). Second, defendant failed to move to strike the testimony he considered objectionable, thereby waiving his right to assert error on appeal. *State v. Adcock*, 310 N.C. 1, 19, 310 S.E.2d 587, 597-98 (1984); *see also State v. Battle*, 267 N.C. 513, 519-20, 148 S.E.2d 599, 604 (1966). Third, we fail to discern prejudice warranting a new trial inasmuch as Agent Leonard gave his own uncontroverted opinion identifying the print on the ashtray as defendant's. The subsequent statement by Leonard that Agent Duncan agreed with his conclusion does corroborate Leonard's testimony, but does not constitute reversible error, especially in light of the fact that the court sustained defendant's objection to the testimony.

Finally, we have held previously that an SBI agent, when testifying about standard SBI procedures for fingerprint identification, may tell the jury that another agent subsequently verified the match. *State v. Jones*, 322 N.C. 406, 368 S.E.2d 844 (1988).

In *Jones*, we stated that under the facts presented and Rule 703 "[t]he opinion of the other examiner . . . necessarily forms a part of the basis for the opinion to which the witness testified, and it clearly was reasonable for an expert in the field of fingerprint identification to rely upon such a procedure." *Id.* at 414, 368 S.E.2d at 848. *Cf. State v. Foster*, 282 N.C. 189, 192 S.E.2d 320 (1972) (new trial granted where nonexpert, defendant himself, forced to testify, over timely objection, as to results of his expert's fingerprint identification). Here, as in *Jones*, the witness testified as to the standard SBI procedures followed which led to his opinion that the fingerprint matched defendant's. Thus, in both *Jones* and this case, the challenged testimony was admissible for a nonhearsay purpose—to establish the basis for expert testimony. *Foster*, involving a nonexpert witness, lacked such a nonhearsay purpose. Defendant is not entitled to relief on this assignment of error.

[14] Defendant next assigns as error the trial court's denial of a pretrial motion to exclude evidence regarding the presence of a brownish-red stain on a bicycle seized from defendant's residence. Defendant also assigns as error the admission of testimony at trial that the brownish-red stain reacted positively to blood. Because the State presented no evidence that the blood was human blood, or that it was consistent with the blood of the victim, defendant argues that the evidence was both irrelevant and unfairly prejudicial.

During direct examination, Agent Sweatt testified as follows:

A. I first found the bicycle in the living room area of [defendant's] residence. After inspecting the bicycle I found a brownish red stain on the left handlebar area of the bicycle. After completing a field test on that brownish red stain—

[DEFENDANT]: Objection.

THE COURT: Overruled.

A. —the brownish red stain, I received a positive reaction to blood.

Defendant argued that the witness had not been qualified properly to give such an opinion about the stain. The court then sustained defendant's objection. Defendant, however, again failed to move that the testimony be stricken, thereby waiving his right to raise this issue on appeal. *See State v. Adcock*, 310 N.C. at 19, 310 S.E.2d at 597-98; *State v. Battle*, 267 N.C. at 519-20, 148 S.E.2d

at 604. Similarly, it was defendant, not the State, who subsequently raised the subject of the bloodstain during his cross-examination of Agent Sweatt. Finally, defendant made no objection to the testimony of David Spiddle. Spiddle, tendered without objection as an expert in forensic serology, testified as to the tests run on the stain and his conclusion that the stain was blood of undetermined origin. We note again that

> [t]he general rule is that when evidence is admitted over objection and the same evidence is thereafter admitted without objection, the benefit of the objection is lost. . . . The absence of a motion to strike or a request for curative instructions, coupled with the fact that defendant elicited evidence of the same or similar import on cross-examination, waived the benefit of the objection.

*State v. Smith*, 290 N.C. 148, 163, 226 S.E.2d 10, 19, *cert. denied*, 429 U.S. 932, 50 L. Ed. 2d 301 (1976) (citations omitted). Because (1) the court sustained defendant's objection, (2) defendant failed to move to strike the objectionable testimony, (3) defendant himself elicited similar evidence on cross-examination, and (4) the same evidence came in later without objection, this assignment of error is overruled.

### III

[15] Defendant argues that he is entitled to a new sentencing proceeding because the evidence was insufficient to support the submission of the aggravating circumstance in N.C.G.S. § 15A-2000(e)(9)—that the murder was "especially heinous, atrocious, or cruel." We reject this contention.

"In determining if there is sufficient evidence to submit an aggravating circumstance to the jury, the trial judge must consider the evidence in the light most favorable to the State." *State v. Huff*, 325 N.C. 1, 55, 381 S.E.2d 635, 666 (1989), *vacated and remanded on other grounds*, --- U.S. ---, 111 L. Ed. 2d 777 (1990). Yet, "a finding that this aggravating circumstance exists is only permissible when the level of brutality involved exceeds that normally found in first degree murder or when the first degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim." *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984).

The facts supporting the submission of this circumstance tend to show that defendant went to the victim's house when the victim was alone. The victim was a seventy-eight-year-old man who had undergone heart surgery and suffered a ruptured appendix. Practically helpless, the victim temporarily fended off defendant's attack, but ultimately suffered seventeen stab wounds in the chest area, abrasions on the face, bruises and lacerations around the mouth, and bruises and incisions on the forearm. Seven or eight wounds extended through the heart and penetrated the left lung; two wounds went through the heart and into the right lung. There was also testimony that the victim could have lived up to ten minutes after sustaining the stab wounds. Viewing these facts in the light most favorable to the State, we conclude that there was sufficient evidence to warrant submission of this aggravating circumstance to the jury. The facts demonstrate brutality exceeding that which is normally found in first-degree murder. *See State v. Lloyd*, 321 N.C. 301, 318-20, 364 S.E.2d 316, 327-28, *vacated and remanded on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988) (seventeen stab wounds, victim killed while alone, several defensive wounds, victim survived five to ten minutes; evidence held sufficient to support "especially heinous, atrocious, or cruel" circumstance).

[16]  By his next assignment of error, defendant contends he is entitled to a new sentencing proceeding under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369. We agree.

In *McKoy*, the United States Supreme Court held unconstitutional under the eighth and fourteenth amendments of the federal constitution jury instructions directing that, in making the final determination of whether death or life imprisonment is imposed, no juror may consider any circumstance in mitigation of the offense unless the jury unanimously concludes that the circumstance has been proved. *Id.* Our review of the record reveals, and the State does not disagree, that defendant's jury was so instructed. The trial court instructed the jury to answer "no" to each mitigating circumstance that it failed to find unanimously. The issue, then, is whether the *McKoy* error can be deemed harmless. *See State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990). "The error . . . is one of federal constitutional dimension, and the State has the burden to demonstrate its harmlessness beyond a reasonable doubt." *Id.*; N.C.G.S. § 15A-1443(b) (1988).

STATE v. QUICK

[329 N.C. 1 (1991)]

The trial court submitted and the jury answered the mitigating circumstances as follows:

ISSUE TWO:

Do you unanimously find from the evidence the existence of one or more of the following mitigating circumstances?

ANSWER Yes

. . . .

(1) The capacity of the defendant, Harold Vernard Quick, to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired?

ANSWER No

(2) That the defendant has been a good family member prior to his incarceration of April 1987, living with his family and conducting himself as a good family member and in a proper manner?

ANSWER No

(3) That the defendant expressed remorse at the death of Charlie Mac Quick to one person after the death of Mr. Quick?

ANSWER No

(4) That the defendant is a good worker and has good employment history with the Karel Company?

ANSWER No

(5) That the defendant is of subnormal intelligence with a history of the use of drugs which causes him to act impulsively and without good judgment?

ANSWER Yes

(6) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value?

ANSWER No

Thus, the jury, acting under the *McKoy* instruction, rejected five of the six mitigating circumstances submitted. In light of "the constitutional importance of preserving the jury's ability to consider

under proper instructions all evidence proffered by a capital defendant that could reasonably mitigate this sentence to something less than death . . . it would be a rare case in which a *McKoy* error could be deemed harmless." *State v. McKoy*, 327 N.C. at 44, 394 S.E.2d at 433 (citation omitted). This is not the "rare case" contemplated by *McKoy*.

Defendant presented substantial evidence in support of at least some of the mitigating circumstances rejected by the jury. With respect to the first circumstance, Terry Warner, a psychologist at Sandhills Mental Health Center, testified that defendant's IQ placed him at the borderline range of intellectual functioning and that his low intelligence limited his "understanding of social rules and customs." In addition, Warner testified that defendant's history of substance abuse could "compromise the abilities he has." This testimony bears directly on the submitted statutory circumstance set forth in N.C.G.S. § 15A-2000(f)(6) and is not subsumed under the nonstatutory circumstance accepted by the jury that defendant's low intelligence and drug use caused him to act impulsively. Statutory circumstances such as this have mitigating value as a matter of law. *State v. Pinch*, 306 N.C. 1, 27, 292 S.E.2d 203, 224, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled in part on other grounds*, *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988).

There also was substantial evidence from which a reasonable juror could have found that defendant was a good worker with a good employment history at Karel Company. Defendant had worked at Karel Company for four or five months prior to his arrest and his supervisor described defendant as a "real good worker" who was on time, had a good attendance record, and was willing to do whatever tasks were assigned.

In light of this evidence, we cannot conclude beyond a reasonable doubt that the erroneous unanimity instruction did not preclude one or more jurors from considering in mitigation defendant's good work record or his diminished capacity to appreciate the criminality of his act or to conform his conduct to the requirements of the law. Nor can we conclude that the jury, acting under proper instructions, would nevertheless have imposed the death penalty. "A single juror's vote could change the sentencing result from death to life imprisonment." *State v. Quesinberry*, 328 N.C. 288, 293, 401 S.E.2d

632, 634 (1991). Accordingly, defendant must receive a new sentencing proceeding.

Defendant's remaining assignments of error relate to issues that defendant recognizes have been decided by this Court contrary to his position, but which he nonetheless brings forward to preserve for further appellate review. These assignments of error are overruled.

Guilt phase: no error.

Sentencing phase: new sentencing proceeding.

Justice MEYER concurring in part and dissenting in part.

I agree with the majority's ruling in this case, that there was no error in the guilt phase of defendant's trial, and I therefore concur in that part of the majority's opinion.

I dissent from that portion of the majority's opinion which finds error in the sentencing phase of defendant's trial and orders a new sentencing proceeding. I find that any *McKoy* error which occurred in the sentencing phase of defendant's trial was harmless beyond a reasonable doubt.

The requirement that the jury find unanimously the statutory mitigating circumstance set forth in N.C.G.S. § 15A-2000(f)(6), "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired," was harmless beyond a reasonable doubt because no evidence of this circumstance was presented. Terry Warner, the psychologist, testified that defendant's reasoning ability was impaired because of his low intelligence and that defendant's use of drugs and alcohol, in his opinion, "would compromise the abilities that he has." The witness' testimony went only to the mitigating circumstance that was found: "That the defendant is of subnormal intelligence with a history of the use of drugs which causes him to act impulsively and without good judgment." The witness did *not* testify that substance abuse impaired his capacity to appreciate that his conduct was criminal or that defendant's ability to conform his conduct to the law *was impaired* by either the low intelligence or substance abuse. The testimony does not establish impaired capacity at the time of the testing or at the time of the murder that would mitigate the offense. There was absolutely no evidence

that defendant was using drugs or alcohol at the time of the murder. Indeed, defendant denied the offense altogether. Mr. Warner was asked only what effect alcohol or drugs *"would be"* on defendant. Thus, this case is distinguishable from *State v. Sanderson*, 327 N.C. 397, 394 S.E.2d 803 (1990), and other such cases, where there was testimony that defendant was using drugs *at the time of the offense*, and the Court found that there was some evidence of impaired capacity which could have been found by at least one juror. Such is not the case here.

Likewise, I find harmless beyond a reasonable doubt the *McKoy* error requiring the jury to unanimously find the nonstatutory mitigating circumstances. First, conceding that defendant was entitled to have the nonstatutory mitigating circumstance that he was a good worker submitted for the jury's consideration without the unanimity charge because there was substantial evidence to support it, in view of the horrible killing of the seventy-eight-year-old physically disabled victim, who lived alone, by the infliction of seventeen stab wounds, I easily conclude that no reasonable juror would have found this circumstance sufficiently mitigating to cause him to change his vote from death to life imprisonment.

While the majority does not discuss the matter, I conclude that the trial court erred in submitting the nonstatutory mitigating circumstance that defendant "was a good family man" or, if it was error, that it was harmless beyond a reasonable doubt because the record is absolutely devoid of any evidence to support it. The record merely shows that defendant lived with his family, though he was twenty-eight years of age.

Likewise, though the majority does not discuss it, I conclude that the trial judge erroneously submitted the nonstatutory mitigating circumstance that defendant expressed remorse over killing the victim. The record reflects only that he made a statement to a cellmate that he did not intend to kill the victim, and even this evidence was refuted by the medical evidence that the defendant stabbed the victim seventeen times.

Having further concluded that the death sentence was not imposed as a result of any passion or prejudice and that the death penalty was proportionate in this case, I vote to find no error not only in the guilt phase, but in the sentencing phase of defendant's trial as well, and to uphold the death penalty imposed by the trial court.